UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CHRISTOPHER BROWING, *et al.*,      ) | |
|                    ) | |
|     Plaintiffs              ) | |
|                    ) | |
|     v.                      ) | CAUSE NO. 3:11-CV-480 JD |
|                    ) | |
| FLEXSTEEL INDUSTRIES, INC., *et al.*,    ) | |
|                    ) | |
|     Defendants.           ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs here are residents or owners in a housing development subject to severe groundwater contamination allegedly caused by the defendants' unpermitted and unlawful dumping of industrial solvents and other hazardous waste. In addition to a toxic tort suit in Indiana state court, they filed a five count complaint in this court. Counts I and II seek treble damages under the Racketeer Influenced and Corrupt Practices Act ("RICO") for an alleged scheme of mail and wire fraud and obstruction of justice designed to conceal the violations and responsibility from the EPA and the public. Counts III and IV seek injunctive relief under the Resource Recovery and Conservation Act ("RCRA"). In Count V, plaintiff Fred Lands, who owns the site on which defendants allegedly dumped their hazardous waste, seeks damages under the Indiana Responsible Property Transfer Law ("RPTL"). The various defendants have filed motions to dismiss all of the counts. This order addresses those motions relating solely to Counts III, IV, and V [DE 65, 66, 68, 69, 71, 72, 73, 91],[1] and the RICO claims will be addressed

---

[1]The motions to dismiss filed by Greg Lucchese [72], and David Dygert [DE 73], are essentially motions for joinder in the two motions filed by Flexsteel. Both are defendants in the the RICO counts, but not in the RCRA or RPTL counts. Because neither defendant raises any additional grounds or arguments to Flexsteel's motion to dismiss Counts I and II, and for simplicity's sake, the Court will treat DE 72, 73 as motions for joinder in DE 74.

in a separate order. For the reasons below, the Court dismisses Count III of the amended complaint but denies the motion to dismiss with respect to Counts IV, and V.

## I. BACKGROUND

The plaintiffs' complaint tells a story of flagrant violations of environmental laws, substantial contamination of groundwater with toxic, carcinogenic chemicals, and a concerted cover-up effort—though the last aspect does not enter much into today's chapter. Back in 1983, David Dygert (a defendant in the RICO counts, but not in Counts III-V) and his wife purchased vacant farmland adjacent to the Meadow Farms Subdivision in Elkhart Indiana. *See* Redacted First Amended Complaint, DE 24, ¶ 105. They leased the property to Dygert's business, Dygert Seating, Inc., which began manufacturing activities on two adjacent tracts of land—23542 Cooper Drive and 53381 Marina Drive. *Id.* ¶ 107. (These, together, are referred to as "the site" throughout this order, except in Part V). The Cooper Drive facility was used for metalwork in connection with seat-manufacturing; the Marina Drive facility was used to manufacture foam seats that were attached to metal frames. *Id.* ¶¶ 109, 110.

In the mid-1990s, Dygert Seating began to experience financial difficulties and, in early 1997, filed for bankruptcy. *Id.* ¶¶ 113–119. Shortly after, Dygert Seating sold substantially all its assets and transferred the site to Flexsteel Industries, Inc.—which manufactured seating products for a range of industries and which already had a history of noncompliance with environmental laws and regulations. *Id.* ¶¶ 120–123. Dygert Seating was administratively dissolved three years later. Dygert, as well as his employees and co-defendants Greg Lucchese and Gerald Alexander, continued to work for Flexsteel's Dygert Seating division at the site. *Id.* ¶ 123. Over the next several years, defendants Flexsteel, PBD Corporation, Lux Steel, Inc., and Dylux Technology,

Inc. all engaged in manufacturing on the site at one point or other. Of these companies, only Flexsteel remains. *See id.* ¶¶ 80–94.

From the mid-1980s until May 2007,[2] employees of first Dygert Seating, then Flexsteel, then PBD, Dylux, and Lux used industrial solvents, including trichloroethylene ("TCE"), methylene chloride, and 1, 1, 1 trichloroethane (TCA)—all of which are listed as hazardous wastes under RCRA—to degrease metal frames, as well as ingredients in adhesives, spot removers, and glue and silicone sprays. *Id.* ¶ 165-178. During this time period, Flexsteel, PBD Corp, Dylux, and Lux all "directed their employees to spray, dump and pour used TCE and other solvents and glues directly onto the ground at the Site, releasing hazardous chemicals including TCE and TCA into the subsurface soil ad ground water at the Site on multiple occasions." *Id.* ¶¶ 124–126; 185–198. They also stored hazardous waste in cardboard boxes and 55-gallon drums and disposed of virtually all of it with regular trash, without making proper waste determination or ever informing their waste hauler of the hazardous nature of their waste or reporting their waste generation activities to the EPA. *Id.* ¶¶ 199–269.

In January 2005, Flexsteel sold the Cooper Drive property to plaintiff Fred Lands. The purchase agreement stated that Flexsteel was not required to provide a disclosure under Indiana's Responsible Property Transfer Law, and Flexsteel did not deliver such a disclosure or otherwise inform Lands of the past disposal practices and widespread dumping of hazardous chemicals.

In August 2007, plaintiff Darlene Knoll had her tap water tested after reading an article about groundwater contamination in the newspaper. *Id.* ¶¶ 127–130. The results revealed TCE contamination at levels as high as 1,360 μg/L—272 times the federal maximum containment

---

[2]Operations obviously ceased prior to January 2005 at the Cooper Driver property.

level for TCE in groundwater. *Id.* ¶¶ 131, 136. Subsequent tests detected levels as high as 330 μg/L in various plaintiffs' drinking water. *Id.* ¶ 135. An environmental health supervisor for the Elkhart County Health Department advised the plaintiffs to immediately stop using their water—not to drink the water, cook with it, or even bathe with it, and to use only cold water when necessary to avoid vapors. *Id.* ¶ 138–140. According to the Federal Agency for Toxic Substances and Disease Registry ("ATSDR"), "[o]ccupational exposure to TCE also has been associated with adult cancers such as kidney cancer, liver and biliary cancer and non-Hodgkin's lymphoma." *Id.* ¶ 143.

That same month, the U.S. Environmental Protection Agency and Indiana Department of Environmental Management ("IDEM") responded by entering into a Cooperative Agreement to investigate, monitor, and evaluate the site. *See* DE 67-2. IDEM tested wells throughout the area and reported to the EPA that "elevated levels of volatile organic compounds were present in 13 of the water samples," and that "water in 10 of the wells sampled had [TCE] levels above the maximum containment level. *See* DE 67-5 at 3–4. IDEM provided residents with bottled water after the testing, and the EPA then provided carbon water filters. *See* DE 67-6 at 61.

The following April, IDEM conducted a site inspection to determine whether the site should be placed on the National Priorities List ("NPL") as a "Superfund" site. *See* DE 67-7 at 10. In September 2008, the site inspection report concluded that "[t]he drinking water in residential wells continues to contain elevated levels of [volatile organic compounds] (some above [the federal maximum containment levels]) prior to filters, and additional private wells have the potential to become contaminated because ground water flow is toward more residential

wells which are not currently impacted." *Id.* at 61–62. Within two months, the EPA had connected 26 homes, including the plaintiffs', to municipal water. *See* DE 67-8 at 3.

In 2009, IDEM notified EPA that it supported including the site on the NPL to "enable the U.S. EPA to determine cleanup alternatives to the impacted areas." DE 67-8 at 2. The EPA proposed the site for listing on the NPL in April, *see* 74 Fed. Reg 67 at 16162–69 (Apr. 9, 2009), and finalized the determination in September, *see* 74 Fed. Reg. 183 at 48412–21. The EPA then began conducting the investigatory phase of its "Superfund" clean-up process, known as Remedial Investigation/Feasibility Study ("RI/FS"). The latest investigatory activities shown in the record are the EPA's intention, in May 2011 to initiate field work to determine the extent and source of the ground water contamination, *see* DE 67-8 at 3, and an August 2011 Public Health Assessment for the Site by the ATSDR, labeling the site as a "past public health hazard, *see* DE 67-10 at 6. On March 6, 2012, however, the ATSDR informed residents that "[t]here is still no concern about current exposures near Lane Street because no one is known to be drinking water from contaminated private wells." DE 67-11 at 2.

In March 2011, the plaintiffs to this action (excluding Fred Lands) filed a complaint in Elkhart Circuit Court seeking damages and injunctive relief under theories of trespass, nuisance, negligence, negligent infliction of emotional distress, punitive damages, and for relief under Indiana's Environmental Legal Action statute. DE 24 ¶ 540, 544. Two months later, they served the defendants with notice of intent to file a RCRA citizen suit in federal district court once the 90-day statutory notice period ended. *Id.* ¶ 545. On December 15, 2011, they filed this action to assert two citizen suit claims under RCRA against Flexsteel and Dygert Seating, over which federal courts have exclusive jurisdiction, as well as plaintiff Fred Land's diversity action under

Indiana's RPTL against Flexsteel. *See* DE 1. On May 15, 2012, the plaintiffs filed a 130 page first amended complaint pleading two RICO claims against Flexsteel and Dygert Seating, as well as David Dygert, Greg Lucchese, Tris Gour, Gerald Alexander, PBD Corporation, Lux Steel, Inc., and Dylux Technology, Inc. *See* DE 18. Two days later, the first amended complaint was sealed to protect the identities of two minor plaintiffs, and a redacted version of the amended complaint was filed. *See* DE 24. The Court refers to the redacted first amended complaint throughout this order.

Through their two RCRA claims, the plaintiffs seek to obtain injunctive relief forcing Flexsteel (the only entity defendant that is still active) to develop a corrective plan, conduct investigation and evaluation, implement an abatement plan, and provide the plaintiffs with the funds necessary to oversee the work. They also seek reasonable attorney and expert witness fees. Plaintiff Fred Lands separately seeks to recover consequential damages, costs, and attorneys fees caused by Flexsteels failure to provide the required environmental disclosure forms at the time Lands purchased the Cooper Drive property.

## II. STANDARD OF REVIEW

The parties dispute the proper standard of review. Some of the defendants's arguments assert that the plaintiffs have failed to state a claim upon which relief may be granted, under Federal Rule of Civil Procedure 12(b)(6). They also claim, under Rule 12(b)(1), that the Court lacks subject matter jurisdiction over the RCRA claims due to CERCLA § 113(h)'s "blunt strip of jurisdiction" for any challenges to EPA removal actions until after they are complete. *See* 42 U.S.C. § 9613(h). Finally, the defendants ask the Court to consider their motion as a motion for

summary judgment, if it is necessary to consider matters outside the complaint to dismiss the matter.

## A.  Rule 12(b)(1) Motion to Dismiss

Rule 12(b)(1) authorizes dismissal of claims over which the court lacks subject matter jurisdiction.  In analyzing a motion to dismiss, the court must accept as true all well-pled factual allegations and must draw all reasonable inferences in favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999).  Further, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citations omitted).  The burden of establishing proper federal subject matter jurisdiction rests on the party asserting it. *Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010).

## B.  Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) authorizes dismissal of a complaint when it fails to set forth a claim upon which relief can be granted.  Generally speaking, when considering a Rule 12(b)(6) motion to dismiss, courts must inquire whether the complaint satisfies the "notice-pleading" standard. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012).  The notice-pleading standard requires that a complaint provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide "fair notice" of the claim and its basis. *Id.* (citing Fed. R. Civ. P. 8(a)(2)); *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (citations omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  In determining the sufficiency of a claim, the court construes the

complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (citation omitted).

In recent years, the Supreme Court has adopted a two-pronged approach when considering a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citing *Twombly*). First, pleadings consisting of no more than mere conclusions are not entitled to the assumption of truth. *Id.* This includes legal conclusions couched as factual allegations, as well as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Second, if there are well-pleaded factual allegations, courts should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chi.*, 671 F.3d. 611, 615 (7th Cir. 2011) (citing *Iqbal* and *Twombly*). The complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Maddox*, 655 F.3d at 718 (citations omitted). However, a plaintiff's claim need only be plausible, not probable. *Indep. Tr. Corp.*, 665 F.3d at 935 (quoting *Twombly*, 550 U.S. at 556). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* In order to satisfy the plausibility standard, a plaintiff's complaint must "supply enough fact to raise a reasonable expectation that discovery will yield evidence supporting the plaintiff's allegations." *Id.* Determining whether a complaint states a

plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *see Iqbal*, 556 U.S. at 679 (citation omitted), and the Court will assess the plaintiffs' claims accordingly.

Rule 10(c) describes the type of materials that can be considered to be part of a pleading:

> A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.

Fed. R. Civ. P. 10(c). This means that a court can consider for purposes of a Rule 12 motion, documents that are attached to a motion to dismiss if they are referred to in the complaint and are central to the plaintiff's claims. *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006); *see Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.") (citations omitted).

## C.    Summary Judgment

Throughout their briefs, the defendants refer to numerous materials not attached to or referred to in the amended complaint, which are outside the "pleadings" identified in Rule 10(c). Under Rule 12(d), the Court must convert the motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the Court." When extraneous materials are presented, it is within the Court's discretion to either exclude the materials and handle the case as a straightforward motion to dismiss, or to consider the materials and convert to summary judgment. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); *DeLeon v. Beneficial Const. Co.*, 998 F. Supp. 859,

862 (N.D. Ill. 1998) (declining to convert motion, noting that "[t]he decision on which course to choose in this matter is entirely within the court's discretion"). If the Court chooses the later path, all parties must have "a reasonable opportunity to present all the material that is pertinent to the motion," Fed. R. Civ. P. 12(d), but "[a]dequate notice is provided when the moving party frames its motion in the alternative as one for summary judgment." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1029 (7th Cir. 2006).

The defendants' primary position is that the motion can be decided in their favor without conversion to summary judgment, either because the necessary extraneous material is all appropriate for judicial notice or because the jurisdictional challenges it raises under Rule 12(b)(1) permit the Court to review any evidence submitted relevant to jurisdiction. Failing that, they also move in the alternative for summary judgment, though since they have not even attempted to comply with Local Rule 56-1, the Court takes this as an invitation to convert (and notice to the plaintiffs of that possibility), not a formal motion for summary judgment.[3] The plaintiffs move to deny or postpone ruling on the defendants' motion for summary judgment under Rule 56(d), so that they can have the opportunity to conduct the discovery necessary to respond to the motion. *See* DE 91. As noted, the Court interprets the defendants' request for summary judgment as an invitation to convert the motion to dismiss, and therefore construes the plaintiffs' Rule 56(d) motion simply as an argument that the Court not convert the motion to dismiss under Rule 12(d) or to delay ruling if it does.

---

[3]In cases like this, the Court respectfully suggests that, while perhaps not expressly required under the rules, a party moving for summary judgment "in the alternative" to a motion to dismiss (or even citing extraneous material that raises a significant possibility of conversion) should comply with Local Rule 56-1.

The Court exercises its discretion to decide the defendants' motion as a straightforward motion to dismiss, rather than converting it to a motion for summary judgment. As noted in the discussion that follows, the extraneous materials (some of which, such as the public agency documents, the plaintiffs concede is appropriate for judicial notice) are not necessary to resolve the RCRA claim under 42 U.S.C. § 6972(a)(1)(A) and not sufficient to resolve the RCRA claim under § 6972(a)(1)(B). With regard to plaintiff Fred Lane's RPTL claim in Count V, the additional evidence would not, by itself, defeat the plaintiff's claim. Moreover, the Court agrees with the plaintiffs that fairness demands they be allowed a reasonable period of discovery on issues raised by their federal claims that were not wholly present in their state law claims.[4] Certainly, the defendants are correct that there may be substantial overlap in discovery between the two cases. *See* DE 101. But the plaintiffs did not raise (and could not raise) their RCRA claims in state court, and plaintiff Fred Lands is not even a party to that suit. And while plaintiffs may obtain some of the evidence they are seeking from federal or state agencies directly, without formal discovery, they still need time to obtain this information. Moreover, the length and scope of the additional discovery to be afforded will be more efficiently handled using standard pre-trial procedures, rather than by a premature summary adjudication. Thus, the Court will exclude any evidence that may not be considered as part of a motion to dismiss and will dismiss the plaintiffs' motion to deny or postpone summary judgment as moot.

---

[4]Even if the Court were to consider the defendants' motion as a proper motion for summary judgment, it would grant the plaintiffs' Rule 56(d) motion. Attorney Rodney L. Michael's declaration, DE 92-1, meets the threshold "good faith showing" that it cannot present facts essential to justify its opposition under Rule 56(d). *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1057 n.5 (7th Cir. 2000). There has been no discovery in this federal case (or by plaintiff Lands at all), and Michael identifies discovery needed, particularly with respect to the § 6972(a)(1)(B) claim.

## III. COUNTS III & IV: FEDERAL RCRA CLAIMS

The Resource Conservation and Recovery Act enacted a "cradle-to-grave" set of policies and procedure to control disposal of solid and hazardous wastes. Development and enforcement authority is shared between federal and state authorities. But while these authorities are the primary means of enforcing RCRA's regulations and standards, they are not the only means. Congress also provided for two types of citizen suits in federal district courts: the first, 42 U.S.C. § 6972(a)(1)(A), allows a citizen to sue any person who "is alleged to be in violation" of RCRA to obtain an injunction to force compliance; the second, 42 U.S.C. § 6972(a)(1)(B), allows a citizen to sue any person who has or is contributing to the handling of hazardous waste that "presents an imminent and substantial endangerment." The plaintiffs here allege counts under both provisions. Below, the Court considers them separately and concludes that the plaintiffs cannot proceed on their § 6972(a)(1)(A) claims because the plaintiffs have not alleged ongoing or intermittent RCRA violations. Resolution of the defendants' claims that the § 6972(a)(1)(B) claim is statutorily bared by CERCLA § 113(h) or § 6972(a)(1)(B)'s own limitations, however, is premature at this stage of the litigation.

### A. The Plaintiffs Do Not Plausibly Allege Any Continuing or Intermittent RCRA Violations

Count III of the plaintiffs' amended complaint asserts a claim under 42 U.S.C. § 6972(a)(1)(A), which permits private citizens to bring suit "against any person . . . who is alleged to be in violation of any permit, standard, regulations, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]." The plaintiffs allege numerous violations of RCRA and implementing regulations during the period in which the various defendants owned and operated the facility and property. While they admit that no

defendant has owned or operated a facility on the property in several years, they assert that the past violations "are continuing violations because the improperly discharged waste remains in the ground and continues to insidiously infect the groundwater resources of the Plaintiffs and other residents and occupants of Elkhart County." DE 24, ¶ 782. In addition, in their response to the motion to dismiss, the plaintiffs also present an alternative theory that the defendants are currently in violation because they *remain* under regulatory obligations to remediate contamination caused by previous violations, despite the cessation of operations and sale of the property. The defendants contend that this claim must be dismissed because all of the violations that the plaintiffs allege in their complaint occurred "wholly in the past."

### 1. The Continuing Effects of Wholly Past Violations Do Not Constitute Ongoing or Intermittent Violations.

The plaintiffs' argument that their allegations of a continued presence of illegally disposed of pollutant meet §6972(a)(1)'s threshold requirement that the defendants be "in violation of" RCRA is one that has troubled and divided district courts. The plaintiffs concede that they cannot bring a claim under § 6972(a)(1)(A) for violations that are "wholly past." The Seventh Circuit has not addressed the requirements of this particular provision, but the Supreme Court interpreted very similar language in the Clean Water Act's citizen suit provision to mean that citizen suits alleging "wholly past" violations could not be brought under provisions authorizing suits against persons alleged "to be in violation" of required standards. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S.49, 57 (1987). While courts agree on the forward-looking posture of the citizen suit provisions, however, the line between an ongoing and a "wholly past" violation has not been so easy to draw, especially in many RCRA cases (and certain CWA cases) "where the conduct that gave rise to the violations has ceased,

but the *effects* continue." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1139 (10th Cir. 2005). In such cases, a citizen suit confined to prospective relief is unnecessary to halt an ongoing or imminent *violation*, but might be useful to abate or remediate the harmful effects of that violation.

In the absence of any binding precedent specifically on point, the place to begin is the language of § 6972(a)(1)(A) itself—that, not a "majority" or "minority" position tallied from various courts and various regulatory schemes, is what authorizes RCRA citizen suits and confers jurisdiction on the Court. That language authorizes suits only against persons "alleged to be in violation" of RCRA or its implementing regulations and standards. As the Supreme Court reasoned in *Gwaltney*, "[t]he most natural reading of 'to be in violation,' is a requirement that citizen-plaintiffs allege a state of continuous or intermittent violations—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57. Thus construed, and drawing on the legislative history, the Supreme Court described the citizen suit provision of the Clean Water Act as an abatement provision meant to end ongoing and prevent likely future violations by past polluters—a focus on the polluter's conduct, not their effects. Given the language and reasoning of *Gwaltney*, the Court concludes that the interpretation of the same language in § 6972(a)(1)(A) offered by the plaintiffs—in which a past polluter who no longer owns or operates a facility can be sued based solely on the effects of wholly past conduct—is inconsistent with Supreme Court precedent.

It appears that the only courts of appeals that have interpreted § 6972(a)(1)(A) have agreed that allegations of violations that had ceased by the time of the citizen suit do not confer jurisdiction on the court—though none of the them expressly discussed the contention that

present, remediable pollution in the environment constitutes a continuing violation even if the culprit has ceased its unlawful disposal. *See Ascon Properties, Inc.*, 866 F.2d 1149 (9th Cir. 1989) (holding that RCRA does not confer jurisdiction over a citizen suit for past illegal disposal of industrial waste and oil field operations, where the alleged conduct occurred before the enactment of RCRA); *Conn. Coastal Fishermen's Ass'n*, 989 F.2d 1305, 1315 (2d Cir. 1993) (rejecting claim seeking to force owner of a former trap and skeet shooting club to remediate lead shot and clay fragments because past discharge was a "wholly past" violation under both RCRA and the Clean Water Act); *Chemical Weapons Working Group, Inc. v. U.S. Dep't of Defense*, 61 Fed. Appx. 556, 559–60 (10th Cir. 2003) (holding that a claim could not proceed under § 6972(a)(1)(A) where all violations occurred prior to the filing of the final amended complaint and the defendant had improved facilities).

Looking at other cases in this circuit, the Court finds Judge Pallmeyer's recent well reasoned decision in *Forest Park Nat'l Bank & Trust v. Ditchfield*, 881 F.Supp. 2d 949 (N.D. Ill. 2012) instructive. In that case, the owner of a residential property sued an adjacent dry cleaning business under both RCRA citizen suit provisions, claiming that past mishandling and improper disposal of perc (*i.e.*, tetrachloroethylene, an organic solvent commonly used in dry cleaning) contaminated the soil and groundwater on its property. *Id.* at 953. Supporting its § 6972(a)(1)(A) claim, the plaintiff alleged two ongoing violations: first, it asserted that the ongoing harmful effects of the unremediated past pollution created a "continuous violation" under *Gwaltney*; second, it argued that the dry cleaning business—which the defendants still owned and operated on the site—was currently in violation of Illinois regulations. Analyzing the language of *Gwaltney* and discussing some of the same cases on which the plaintiffs here rely, Judge

Pallmeyer rejected the argument that the continuing effects of wholly past conduct could itself satisfy the requirement of a continuing or intermittent violation. *Id.* at 697. She acknowledged that other district courts had reached the opposite conclusion, but noted that the only courts of appeal to consider the issue had agreed that ongoing effects of past violations did not confer jurisdiction over a § 6972(a)(1)(A) violation. *See id.* at 695–96. *Accord Board of County Com'rs of La Plata, Colo. v. Brown Group Retail, Inc.*, 598 F. Supp. 2d 1185 (D. Colo. 2009).

Judge Pallmeyer also perceptively noted that her interpretation that plaintiffs could not use § 6972(a)(1)(A) to force a past violator to remediate the ongoing harm caused by its violation did not mean there is no recourse for past violations. She pointed out that RCRA's other citizen suit provision, § 6972(a)(1)(B), authorizes suit against any past or present owner or operator that "'contributed to' the handling of hazardous waste that 'may present an imminent and substantial endangerment to health or the environment.'" *Forest Park*, 881 F. Supp. 2d at 967. Indeed, she reasoned that the presence of this second citizen suit provision bolstered her conclusion because allowing a remediation-only suit to proceed under § 6972(a)(1)(A) would make § 6972(a)(1)(B) superfluous and, worse, sidestep Congress's deliberate limitation of citizen suits against past pollution to cases presenting an imminent and substantial danger. *Id.*

The Court agrees with these observations and to them would add another. In addition to the "imminent and substantial endangerment" requirement, Congress was also careful to limit the availability of citizen suits under § 6972(a)(1)(B) when the EPA or a State is already engaged in removal or remediation efforts. *See* 42 U.S.C. § 6972(b)(2)(B). For § 6972(a)(1)(A) suits, on the other hand, Congress chose to bar suits only when the EPA or State is prosecuting a civil or criminal action in federal court. Allowing plaintiffs to use § 6972(a)(1)(A) to remediate

current effects of wholly past violations, rather than merely to abate ongoing and prevent future violations, would erase this carefully drawn distinction between the two complementary citizen suit provisions.

The plaintiffs counter that what they call the "majority rule" among the courts that have considered the issue, is consistent with their position that where contamination from past violations remains in the environment and is remediable, a citizen plaintiff may proceed under § 6972(a)(1)(A). They do cite an impressive number of cases from districts around the country interpreting both § 6972(a)(1)(A) and the corresponding provision of the Clean Water Act. But aside from the inherent weakness of a majority rule that has apparently not been adopted by a single court of appeals, this purported majority rule is undermined by the distinct statutory or regulatory regime in which the various cases arise.

Many of the cases cited fall into two categories: (1) Dredge fill (or similar) cases under the Clean Water Act, *see, e.g.*, *Stillwater of Crown Point Home-Owner's Ass'n. v. Kovich*, 820 F.Supp.2d 859 (N.D. Ind. 2011); *Greenfield Mills, Inc. v. Goss*, No. 1:00 cv 0219, 2005 WL 1563433 (N.D. Ind. June 28, 2005); *Potomac Riverkeeper, Inc. v. Nat'l Capital Skeet & Trap Club*, 388 F. Supp. 2d 582 (D. Md. 2005); and (2) Underground Storage Tank ("UST") cases under RCRA. *See, e.g.*, *Dydio v. Hesston Corp.*, 887 F.Supp. 1037 (N.D. Ill. 1995); *Raymond K. Hoxsie Real Estate v. Exxon Ed. Foundation*, 81 F. Supp. 2d 359 (D.R.I. 2000). Without deciding whether the cited cases correctly applied *Gwaltney* to their circumstances, the Court notes that these situations are all materially distinguishable from the case of a simple past violation of RCRA that has ongoing harmful effects.

First, the Clean Water Act, unlike RCRA, has no complimentary citizen suit provision allowing a remediation-only suit in cases of imminent and substantial endangerment. Many courts' explicit motivation for extending citizen suits to cases where remediable pollution remains is that a lack of any citizen remedy for such situations in the Clean Water Act would encourage polluters to conceal their activities or "dump and run." *See, e.g.*, *Greenfield Mills*, 2005 WL 1563433, at *4. That rationale is simply inapplicable to RCRA cases where a separate provision provides precisely the relief lacking in the Clean Water Act.

Second, underground storage tanks are subject to a separate RCRA regulatory regime which, critically, continues to deem a person the owner and operator of the tanks even after the property itself had been sold. *See* 42 U.S.C. 6991(4); 40 C.F.R. 280.12. Thus, in *Dydio*, Judge Castillo in the Northern District of Illinois held past owners of a property subject to suit under § 6972(a)(1)(A) for ongoing contamination from their underground storage tanks by distinguishing "wholly past violation" cases on the grounds that "[i]t is evident from the regulatory definition of an owner . . . that RCRA contemplates reaching those who have owned USTs in the past and imposes *present requirements and duties upon them.*" 887 F. Supp. at 1043 (emphasis added). The defendants were thus allegedly *currently* in violation of RCRA corrective action requirements. *Id.* This distinct definition of owner is not applicable in the case at hand.

Nevertheless, several of the plaintiffs' cases do hold, contrary to the Court's conclusion above, that the present harmful effects of past violations constitute a continuing violation under § 6972(a)(1)(A). Some of these involved situations in which the past violator remained the actual or constructive owner of the polluted site, and thus might be considered "to be in violation" of continuing corrective action requirements, similar to the underground storage tank cases

discussed above—although, in fairness, the cases themselves do not seem to rely on this theory. *See, e.g.*, *Fallowfield Dev. Corp. v. Strunk*, CIV. A. No. 89-8644, 1990 WL 52745 (E.D. Pa. 1990) (holding past owner to be constructive owner and allowing suit under § 6972(a)(1)(A) for continuing effects of past pollution); *Pottstown Indus. Complex v. P.T.I.*, Civ. A. No. 91-5660, 1992 WL 50084 (E.D. Pa. 1992) (relying on *Fallowfield*). Several of the plaintiffs' cases, however, including one from a district court in this circuit, appear to squarely hold that a past owner or operator may be sued under § 6972(a)(1)(A) based on the continuing effects of their conduct. *See Truck Components Inc. v. Beatrice Co.*, No. 94C3228, 1994 WL 520939 (N.D. Ill. Sept 21, 1994). *See also Scarlett & Associates, Inc. v. Briarcliff Center Partners*, LLC., No. 1:05-cv-0145-CC, 2009 WL 3151089 (N.D. Ga. Sept. 30, 2009); *City of Toledo v. Beazer Materials & Services, Inc.*, 833 F. Supp. 646, 656 (N.D. Ohio 1993); *Gache v. Town of Harrison, N.Y.*, 813 F. Supp. 1037, 1041 (S.D.N.Y. 1993), *abrogated by Remington Arms*, 989 F.2d 1305.

The Court respectfully disagrees with these decisions. Distilling the reasoning in these cases, the Court notes three general bases for their holdings. First, they focus on the continuing effects of past *pollution*, rather than the continuing or intermittent violations of present or future *polluters*. *See Truck Components*, 1994 WL 520939 at *6; *Fallowfield*, 1990 WL 52745 at *10; *Scarlett*, 2009 WL 3151089 at *12. Yet in this they are inconsistent with the statutory language and the Supreme Court's holding in *Gwaltney*.

Second, some rely on the past tense of a separate sentence in § 6972(a), which provides that "any action under paragraph (a)(1) of this subsection shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur." *See*

19

*Truck Components*, 1994 WL 520939 at *6. But this section applies to both "in violation of" suits under subparagraph (a)(1)(A) *and* "imminent and substantial endangerment" suits under (a)(1)(B), which may be brought against any person "who *has contributed* or who is contributing to the *past* or present" cause of endangerment. The use of the past tense is necessary to cover all the situations covered by the single venue provision, and does not suggest that Congress intended to allow suits under subparagraph (a)(1)(A) where there was no continuing violation.

Finally, they distinguish *Gwaltney* and Clean Water Act cases because hazardous waste disposed into the ground has a persistent effect on the soil and groundwater and remains remediable, unlike the evanescent effects of air and water pollution. *Truck Components*, 1994 WL 520939 at *6; *Pottstown Indus. Complex v. P.T.I.,* 1992 WL 50084 at *6–7; *Fallowfield*, 1990 WL 52745 at *10. And thus they may have been, like similar courts confronted with persistent effects of certain Clean Water Act violations, (admirably) motivated to avoid what they perceived as loopholes in the environmental laws and extend the coverage of § 6972(a)(1)(A) farther than *Gwaltney* appears to allow. *Cf. Greenfield Mills*, 2005 WL 1563433 at *4 ("[T]o hold no continuing violation exists when the very consequence of an illegal discharge is the harm, would provide no remedy to plaintiffs such as the ones in this case, where the relief sought is remediation of discharge materials from illegal dredging activities."). If so, however, they both usurp the role of Congress in establishing the parameters of the citizen suit provisions and fail to appreciate the remedial scheme that Congress has already provided in RCRA and elsewhere, consisting to broad enforcement powers for the EPA and States and the complementary citizen suit provision in § 6972(a)(1)(B).

For these reasons, the Court finds the plaintiffs' arguments unavailing: only continuing *violations*, not the ongoing effects of past pollution, are the proper subject of § 6972(a)(1)(A).

## 2. The plaintiffs do not plausibly allege violations of corrective action requirements

The second conceivable ground for a citizen suit under 42 U.S.C. § 6972(a)(1)(A) may be handled more briefly. It is not mentioned in the first amended complaint, but the plaintiffs in their response briefly argue that although the defendants concededly no longer own the site or operate their facility, they may still be in violation of ongoing corrective action requirements while contaminants remain in the soil and groundwater. They thus liken this case to *Dydio* and other underground storage cases as well as *Forest Park*, which ultimately sustained the plaintiff's suit based on separate allegations of continuing violations of Illinois regulations implementing RCRA.

There are two fundamental problems with this argument. First, the first amended complaint itself nowhere alleges that the defendants are currently in violation of any RCRA regulation or standard. The complaint consistently alleges that the defendants violated RCRA when they, for example: "operated a "facility" used for disposal of hazardous wastes without a permit," DE 24 ¶ 758; "disposed of hazardous waste in violation of 42 U.S.C. § 6982(d)(2),"*id.* ¶ 759; "failed to perform waste determinations," *id.* ¶ 764, "[b]y directing employees to dump, spray and pour waste TCE and other solvents and glues directly onto the ground . . . violated 40 C.F.R. § 268.38," *id.* ¶ 761; and "by thereafter failing to implement corrective action at the Site . . . violated 40 C.F.R. Part 264," *id.* ¶ 762. The last does mention "corrective action" regulations, but does not allege that the defendants are *currently* subject to any such regulations.

Given the extraordinary detail in the amended complaint, this lack of direct allegation is striking in its absence.

Second, even if the complaint were read to generally allege an ongoing violation of corrective action requirements, the plaintiffs have not explained which regulations apply or how. Again, a specific current corrective action requirement is conspicuous by its absence from the complaint—whereas *every* past allegation cites to a specific statutory or regulatory provision, the "corrective action" allegation cites to an entire part of the RCRA regulations containing numerous different requirements applicable in various situations to owners and operators. Given a chance to further explain their corrective action theory in their response brief, the plaintiffs provide no more specific citation or explanation of how these regulations apply to the defendants, who have not owned or operated the site in several years.

This is a critical difference between the case at hand and the underground storage tank cases and *Forest Park*. As noted above, underground storage tanks are subject to a separate regulatory scheme that deems certain persons owners and operators of tanks long after they have sold the property on which they are buried. Further, contrary to the plaintiffs' suggestion, *Forest Park* did not find a general ongoing violation for a past operators' failure to develop or implement a closure plan. 881 F. Supp. 2d at 967–69. Rather, the dry cleaning business was still in operation, and was engaged in ongoing violations of specific Illinois regulations requiring it to properly label for hazardous waste drums, "maintain records of removal of drums," "submit annual hazardous waste reports," "draft and maintain a written closure plan," and "operate the business in a manner designed to minimize unplanned releases of hazardous waste." *Id.* at 968. The plaintiffs assert no similar current violations here. Count III must be dismissed.

**B.**     **Count IV States a Claim under 42 U.S.C. § 6972(a)(1)(B)**

What the plaintiffs seek is remediation of the harmful effects of past pollution, rather than the enjoining of continuous or intermittent violations. Thus, the proper avenue for a citizen suit in this case is the second RCRA citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), which authorizes a suit

> against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator or a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

There is no doubt that the plaintiffs allege that Dygert Seating, Flexsteel, PBD Corp., Lux Steel, and Dylux Technology are all past owners or operators who have contributed to the past handling and disposal of hazardous waste. *See* DE 24 ¶ 785. The defendants raise two other challenges to the § 6972(a)(1)(B) claim, however: First, they contend that the citizen suit cannot proceed because the intervention of the EPA and IDEM trigger separate statutory bars both in Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and within RCRA's own citizen suit provisions. Second, they argue that even if the suit is not barred, the plaintiffs have failed to allege a plausible imminent and substantial danger because no one is currently known to be exposed to contaminated groundwater. The Court will address the arguments in the reverse order, however, since the existence of a potential federal cause of action based on "imminent and substantial endangerment" logically precedes the application of a statutory bar to such a cause of action.[5]

_____

[5] As discussed below, there is no merit to the defendants' contention that the statutory bars deprive the Court of subject matter jurisdiction. *See* III.B.2.ii

### 1.    The Plaintiffs Allege "Imminent and Substantial Endangerment."

As noted, § 6972(a)(1)(B) permits a citizen suit "only upon a showing that the solid or hazardous waste at issue 'may present an imminent and substantial endangerment to health'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996). This means that "there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Id.* (quoting *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (1994)). The defendants contend that based on the plaintiffs' allegations and the public agency documents subject to judicial notice, it is clear that the plaintiffs have no plausible claim that the defendants' alleged past violations contributed to any present "imminent and substantial endangerment." This is because, they argue, the record reveals that everyone affected by contaminated groundwater has been placed on municipal water; if there is no longer any pathway by which the contaminated groundwater can be consumed, it follows, there can be no imminent endangerment.

In support of their argument the defendants cite to several allegations in the amended complaint for their contention that the plaintiffs "admit" that the hazardous waste does not present an imminent and substantial danger to human health and the environment. First, the amended complaint states that "a public drinking water supply has now been provided to resident plaintiffs." DE 24 ¶ 164. Second, they point to allegations that the ATSDR performed a public health assessment for the site and concluded that it was a "*past* public health hazard" and that "people who *drank* water from private wells containing the highest levels of TCE . . . had an increased risk of adverse health effects." *Id.* ¶¶ 145–151. The defendants' also cite to similar details in the ATSDR report itself, which they claim completely undermines the plaintiffs' arguments.

The defendants may be correct that when hazardous waste has no exposure pathway, it does not necessarily present an imminent danger. *See Avondale Fed. Sav. Bank v. Amoco Oil Co.*, 170 F.3d 692, 695 (7th Cir. 1999) (finding no imminent danger where expert witness testified that contamination under property would only present a health risk if excavation were ever performed). But even assuming that the Court can consider the ATSDR report itself without converting the motion to summary judgment, which it has chosen not to do,[6] it does not establish that there is no imminent and substantial danger. For one, even if it conclusively suggested that there was in fact no imminent danger to human health, it would represent no more than the conclusions of one agency, not an unassailable truth.

Moreover, the ATSDR report does not rule out imminent danger at all. First, the report specifically concludes that "exposure from wells still in use may pose a potential future public health hazard if contaminant levels increase"—these effects may be some time off, but without any specific timeframe the Court could not evaluate the imminence of the danger. *See* DE 67-10 at 7. Second, the report indicates that not all wells in the area were tested, *see id.* at 7, 20, so it is possible that some area residents may still be drawing contaminated groundwater from wells. Finally, the report is inconclusive regarding the possibility of health effects due a process it describes as "vapor intrusion," by which volatile organic compounds from contaminated

---

[6] It is not clear that the document fits into any of the categories of documents appropriately considered on a Rule 12(b)(6) motion to dismiss. Judicial notice is not proper—the fact that an environmental study was undertaken by a government agency hardly establishes that the accuracy of its conclusions "cannot reasonably be questioned." *See General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997). The document is referred to in the amended complaint, *see Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994), but the defendants make no attempt to explain why this document is "central to [their] claim."

groundwater escape into the air and enter homes. *Id.* Thus, while the ATSDR report may not

establish an imminent danger, and may even suggest that any danger was remote, it does not

permit the Court to conclude, on a motion to dismiss, that the plaintiffs can not plausibly show

that the defendants' alleged disposal of hazardous waste does not "present an imminent and

substantial endangerment to health or the environment."

### 2.      Dismissal Based on Statutory Bars Is Not Appropriate at this Stage.

Several statutory provisions bar a citizen suit under § 6972(a)(1)(B) where the EPA or

state agency is already engaging in removal or remedial action. By way of background, removal

actions are short-term action to abate the immediate risks of hazardous wastes; remedial actions,

on the other hand, are "those actions consistent with permanent remedy taken instead of or in

addition to removal actions" 42 U.S.C.A. § 9601(23)–(24). The statutory bars can be helpfully

addressed in two categories: the general "timing of review" provision of CERCLA § 104 and the

specific limitations contained within RCRA's citizen suit provision itself. Ultimately, it is

premature to decide either issue on the limited record available to the Court on a motion to

dismiss under Rule 12(b)(6).

### i.      CERCLA Section 113(h)

CERCLA provides an framework applicable to multiple environmental statutes to guide

the cleanup of hazardous waste sites. To help ensure that litigation would not impede ongoing

cleanup efforts, Congress enacted § 113(h), providing that, subject to certain exceptions, "[n]o

Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal

or remedial action selected under [CERCLA § 104]." 42 U.S.C. § 9613(h). The main exception

to this bar is that a plaintiff may generally challenge a removal or remedial action under

CERCLA's citizen suit provision (42 U.S.C. § 6959) once the selected action is complete, as long as further remedial action is not in the works. *Id.* § 9613(h)(4).[7] The defendants argue that the EPA has engaged in a removal action at the site and this bars the plaintiffs' RCRA citizen suit. The Court holds, however, that the defendants' argument that this suit is barred by CERCLA § 113(h) is premature. Based on the allegations in the complaint and the public agency documents attached to the motion to dismiss, and making all reasonable inferences in favor of the plaintiffs, the Court cannot conclude this case currently "challenges" any selected removal or remedial action.

Preliminarily, the Court notes that the defendants discussion of CERCLA § 113(h)'s "jurisdiction strip" does not tell the whole story. By seeking dismissal under Rule 12(b)(1), they clearly suggest that § 113(h) deprives the Court of *subject matter* jurisdiction over this claim. That is certainly a plausible interpretation, given the "jurisdictional" language of the statute, and some courts may agree. *See, e.g.*, *Cannon v. Gates*, 538 F.3d 1328, 1330 (10th Cir. 2008) (discussing the bar in terms of subject matter jurisdiction). What the defendants do not inform

_____

[7]The complete text of the relevant portions of CERCLA § 113(h) follows:

> No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order under section 9606(a) of this title, in any action except on of the following: . . .
>
>> (4) An action under section 9659 of this title (relating to citizen suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

42 U.S.C. § 6913(h).

the Court, however, is that the Seventh Circuit has expressly *rejected* this interpretation and instead considers § 113(h) a "claims processing rule" that may *defeat* a citizen suit, but which does not deprive the federal courts of subject matter jurisdiction. *See Frey v. EPA*, 270 F.3d 1129, 1132–33 (7th Cir. 2001) (*Frey I*). Indeed, the defendants do not mention *Frey I* at all in their opening brief, nor the court's subsequent decision in *Frey v. EPA*, 403 F.3d 828 (7th Cir. 2005) (*Frey II*), where it applied § 113(h)'s (non-jurisdictional) bar in a case quite similar to this one.

Turning to the substance of CERCLA § 113(h), "[t]he obvious meaning of this statute is that when a remedy has been selected, no challenge to the cleanup may occur prior to the completion of the remedy." *Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir. 1990). Even where no remedial action has been selected, a plaintiff may not challenge a removal action "where a remedial action 'is to be undertaken.'" *Id.* (quoting 42 U.S.C. § 9613(h)(4)) Thus, there are three questions that a court must ask in deciding whether a particular citizen suit is barred by CERCLA § 113(h): (1) whether the EPA has selected a removal or remedial action; (2) whether the plaintiff's suit challenges that action; and (3) whether the selected action is complete or, if the EPA has as yet only selected a removal action, whether "remedial action is to be undertaken at the site."

With regard to the first question, there is no dispute either that the EPA has selected removal actions or that it has not (yet) selected any remedial action. Removal actions under CERCLA § 104 include, *inter alia*, "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" and the "provision of alternative water supplies." 42 U.S.C. § 9603(23). From the public agency documents subject to

judicial notice, it is readily apparent that the EPA took removal action by conducting a site investigation and (as a result of what was discovered) connecting homes (including the plaintiffs') to municipal water to remove the threat of contaminated well water. *See* DE 67-6, 67-7 at 2.

There is also some indication that the EPA was planning additional investigation and monitoring as of May 2011, six months before this suit was filed and a year before the amended complaint. *See* DE 67-7. The record does not reveal the exact nature and extent of these activities, however, and not all ongoing investigations constitute removal actions. *See Frey II*, 403 F.3d at 835–36 (holding that ongoing study was not a removal action, noting that "[r]emoval is concerned with minimizing and mitigating damages from the 'threat of release' or a hazardous substance through measures such as 'security fencing,' 'temporary evacuation' and 'emergency assistance.'"). For purposes of this analysis, however, the Court will assume these ongoing activities constitute incomplete removal actions that cannot be challenged. Thus, the EPA has selected (and perhaps continues to engage in) certain removal actions, but there is no indication that the EPA has selected any permanent remedial action.

The second question is a bit more difficult. CERCLA § 113(h) plainly does not bar all citizen suits once removal or remedial action is underway, only those suits that "challenge" the remedy that has been (or is to be) selected. What does it mean to "challenge" a removal or remedial action? The Seventh Circuit has said little on this particular question. But in its cases discussing CERCLA § 113(h) more generally, it has explained that the purpose of this particular statutory prohibition is "to prevent unnecessary delay in implementing hazardous waste cleanups." *Schalk*, 900 F.2d at 1095. *See also North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244

(7th Cir. 1991) ("[T]he purpose of section 113(h) is to prevent litigation from delaying remediation."). This suggests that a suit can be said to "challenge" a removal or remedial action when it interferes with and thus potentially delays an ongoing action.

Where there is an ongoing remedial plan, it is relatively easy to determine whether a particular suit will interfere with and delay clean-up efforts—most will, particularly where they seek to require the EPA itself to reconsider or enjoin it from taking certain selected actions. For example, the Seventh Circuit has held that a potentially responsible party could not challenge the cost-effectiveness of "a measure that is ordered as part of a remedial plan, and that is reasonably related to the plan's objectives." *North Shore Gas*, 930 F.2d at 1244. The obvious effect of such a challenge is to delay the selected remedial action until after the litigation is resolved.

It is less clear that a challenge to a removal action is always as likely to interfere with clean up efforts. Some sorts of challenges may. If the EPA has selected and not yet undertaken (or is in the process of selecting) a remedial action, a lawsuit seeking to require additional assessment would delay the selection and implementation of remedial action. *See Schalk*, 900 F.2d at 1096 (rejecting challenge to the adequacy and potential environmental effects of remedial actions proposed in consent decree between the EPA and a private company). Further, if a removal action included the provision of alternate water supplies to prevent exposure to contamination, a plaintiff could clearly not challenge that action until it was complete.

But if a removal action were complete—or stalled—and no additional removal or remedial actions have been selected or are under active consideration, litigation may serve to accelerate, rather than delay, clean up efforts. Such suits are not necessarily barred. The Seventh Circuit has not confronted this exact question, but it came close in *Frey II*, 403 F.3d 828. There,

selected remedial actions had been completed and the EPA argued that its "ongoing investigation and testing of groundwater and soil contamination precludes review under the statute." *Id.* at 834. The court rejected the argument, holding that "[f]or the EPA to delay Frey's suit, it must point to some objective referent that commits it and other responsible parties to an action or plan." *Id.* The Court sees no reason why the same rule would not apply when the EPA has not yet selected any remedial actions—the point of *Frey II* is that an investigation or study should not bar citizen suits unless there is evidence that clean-up efforts are in sight.

At least one other district court in this circuit has agreed. The Court notes that Judge Pallmeyer's well-reasoned decision in *Forest Park*, discussed extensively above with regard to Count III, also considered whether CERCLA § 113 bars a suit under 42 U.S.C. § 6972(a)(1)(B) where EPA response actions have apparently stalled. *See* 881 F. Supp. 2d at 970–73. There, after voluntarily taking certain response or remediation measure, the primary defendant had entered a settlement agreement with the EPA to repay other "past response costs." *Id.* at 960–61. The plaintiff sought to recover its own response costs as well an injunction requiring the defendants to implement a corrective action plan. *Id.* at 953. The defendants sought summary judgment, arguing that CERCLA § 113(h) barred the plaintiffs' suit. Assuming, without deciding, that § 113(h) covered the settlement agreement, Judge Pallmeyer noted that although the defendants claimed that there were ongoing response actions, there was no evidence of "any concrete plan designating who will conduct future testing or at what time." *Id.* at 972. Quoting the Seventh Circuit, she noted that the purpose of § 113(h) was to "'ensure that, once the EPA chooses a removal or remedial action for a particular site, litigation will not delay the completion

or enforcement of a cleanup action.'" *Id.* (quoting *Vill of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 784–85 (7th Cir. 2008)). She went on,

> There is no evidence that this litigation is delaying or will delay the completion of an ongoing cleanup action. To the contrary, the evidence suggests that [the plaintiff's] *suit seeks to jumpstart a nonexistent cleanup action*. In that sense, this RCRA citizen-suit provision serves the very gap-filling purpose for which the citizen suit provision was designed.

*Id.* Thus, she concluded that § 113 did not bar the plaintiff's suit.

The defendants argue that this suit, and the requested relief, would interfere with the EPA's ongoing and future removal and remedial efforts, but the limited record does not permit the Court to make these sort of determinations regarding the nature of ongoing actions and the concreteness of remedial plans going forward. For example, the complaint asks the Court to require certain defendants to develop a corrective action plan and conduct investigation and evaluation, but it is not immediately clear how this preliminary step would interfere with any current EPA involvement in the site. Obviously, if the EPA does have firm plans to continue the process of selecting and implementing a remedial plan, then an injunction requiring the defendants to "implement an abatement plan . . . to eliminate all risks to the public and the environment" would likely interfere with clean up efforts. At this point, however, it is not clear whether the effect of this litigation will be to "jumpstart a nonexistent cleanup action" or "to delay the completion or enforcement of cleanup action." Therefore, the motion to dismiss based on CERCLA § 113 is premature and resolution of this issue must proceed to summary judgment (or beyond) for the necessary factual discovery and development.[8]

---

[8]Because the Court holds that it cannot determine at this stage whether the plaintiffs suit challenges a selected removal or remedial action, it is not necessary to delve further into the complicated question of whether a potentially challenged action is "complete." *See Frey II*, 403

*ii.* *RCRA Limitations: 42 U.S.C. § 6972(b)(2)(B) & (C)*

RCRA has its own complimentary limitations on "imminent and substantial endangerment" citizen suits under § 6972(a)(1)(B) when the EPA or a State agency has begun removal or remedial actions. With regard to the EPA, § 6972(b)(2)(B) provides that "no action may be commenced under subsection (a)(1)(B) of this section" if the EPA is either "actually engaging in a removal action under section 104 of [CERCLA]" or "has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of [CERCLA] and is diligently proceeding with a remedial action under that Act." Section 6972(b)(2)(C) provides identical limitations when a State is involved in removal or remedial efforts.[9] Like the CERCLA bar, these provisions may ultimately defeat a claim but do not deprive the Court of subject matter jurisdiction. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 491 (7th Cir. 2011) ("The parties and the district court treated the statutory bar issue as a question of subject matter jurisdiction. This was incorrect.").

The defendants argue that based on the public agency documents, this case must be dismissed for three reasons. First, the EPA has taken removal action (described above), triggering § 6972(b)(2)(B)(ii). Second, IDEM has also engaged in removal action, triggering § 6972(b)(2)(C)(ii). Third, EPA is conducting an remedial investigation feasibility study, triggering § 6972(b)(2)(B)(iii). The plaintiffs respond that each of these statutory bars involves

---

at 833–34.

[9]The provisions also prohibit suits where the EPA or State "has commenced and is diligently prosecuting an action under section [42 U.S.C. § 6973]," but there is no suggestion that this provision is applicable here.

factual questions that cannot be resolved on the record as it is. The Court agrees with the plaintiffs.

Looking to the statutory texts, it is clear that all three provisions require an inquiry into the circumstances of the EPA or IDEM action at the time the suit was commenced. *See Adkins*, 644 F.3d at 493 (holding that similar language in 42 U.S.C. § 6972(b)(1)(B) (pertaining to limitations on "in violation of" suits under § 6972(a)(1)(A)) allows a suit to continue as long as the EPA is diligently prosecuting a case when the suit is filed). Thus, a suit is not barred by § 6972(b)(2)(B)(ii) or (C)(ii) unless the EPA or State, respectively, is *actually engaging* in removal action at the time a suit is commenced. The defendants' exhibits do suggest that some investigative activity occurred in 2011; if if the evidence ultimately shows that these efforts were ongoing in December 2011 (or perhaps May 2012) and that they were removal actions, rather than simply part of the RI/FS, the suit might be barred. *See Frey II*, 403 F.3d 835–36 (discussing the difference between investigations taken from remedial purposes rather than removal purposes). The Court cannot conclude at this point, however, that either the EPA or IDEM was actually engaging in a removal action because, as discussed above, the record is not clear regarding the status and nature of EPA and IDEM actions when the suit was commenced.

Likewise, § 6972(b)(2)(B)(iii) does not apply unless the EPA "has initiated a RI/FS and is *diligently proceeding with* some remedial action *beyond the [RI/FS]*." *Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498, 1509 (E.D. Wisc. 1992). The defendants' argument fails here, however, because they nowhere identify any remedial action beyond the RI/FS that the EPA was proceeding with (diligently or otherwise) at the time the plaintiffs commenced this suit. Again, if the evidence shows that the EPA was diligently pursuing remedial action at the time

the plaintiffs commenced this action, the suit might fail, but this factual inquiry cannot be completed on the current record.

## IV. COUNT V: INDIANA RPTL CLAIM

The final issue the Court will address in this order is Fred Land's claim (Count V) under the Indiana Responsible Property Transfer Law, Ind. Code § 13-25-3-1 *et seq*. The RPTL requires the transferor of certain "property," as that term is specially defined in Ind. Code § 13-11-2-174, to provide a disclosure form to the transferee identifying past uses of the property and potential environmental defects. *See generally* Pl. Reply Ex. 9, DE 103-5.[10] Failure to provide the disclosure document as required by law is a civil infraction, and also provides a cause of action for the offended party to recover consequential damages, reasonable costs, and attorneys fees. Ind. Code. § 13-25-3-15.

"Property" is only subject to the disclosure requirements, however, if it falls into one or more of three categories: (1) it is the site of any underground storage tank; (2) it is listed on the EPA's Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) list; or (3) it "contains one or more facilities that are subject to reporting under Section 312 of the federal Emergency Planning and Community Right-to-Know Act of 1986 [EPCRA]." Ind. Code. § 13-11-2-174. EPCRA, in turn, requires businesses that handle hazardous chemicals to submit annual inventory reports of hazardous substances if certain threshold amounts are present at any one time during the preceding calendar year—generally,

---

[10]This exhibit is merely a copy of a publicly available document entitled: IDEM Memorandum re Environmental Disclosure Required in Transfer of Real Property under Indiana Code (IC) 13-25-3, available at IDEM's webite: http://www.in.gov/idem/4691.htm.

500 pounds or more of an "extremely hazardous substance" or 10,000 pounds or more of any hazardous chemical. *See* 40 C.F.R § 370.10.

Land alleges that the Cooper Drive Property was subject to the RPTL's disclosure requirement, but that Flexsteel never provided the required disclosure document. The property has no underground storage tanks. The amended complaint alleges, however, that "even though manufacturing activities had ceased at the Cooper Drive Property as of the date of transfer, the [property] nevertheless had been and remained subject to reporting under Section 312 of EPCRA." DE 24, ¶ 792. It also alleges that although the site was not listed on CERCLIS at the time of the transfer, it would have had the appropriate agencies been aware of the defendants' disposal practices. *Id.* ¶¶ 790, 797. Flexsteel contends that it was not required to provide a RPTL disclosure document because it was not subject to EPCRA reporting requirements at the time of the transfer and the property was not listed on CERCLIS.[11] It claims that the complaint alleges that the last time the property was subject to EPCRA reporting requirements was 1992–93, long before the sale. *See* DE 67 at 22 (citing DE 24 at ¶ 499).

This requires the Court to construe the definition of "property" that triggers RPTL's disclosure requirements. Flexsteel points out that RPTL's definition of "property" uses the present tense: the real estate is only "property" if it "contains one or more facilities that *are*

---

[11]According to the opening brief in support of the motion to dismiss: "Flexsteel did not have any operations at the Cooper Drive property for at least five years before it sold the property to plaintiff Lands and there were no hazardous chemicals present on-site that would trigger EPCRA Tier II reporting obligations at the time of the sale." DE 67 at 6. This brief provides no citation for this assertion, however, and it does not appear in the complaint. The only basis for its contention that it was not subject to EPCRA reporting requirements in 2005 seems to be an Environmental Site Assessment conducted in 2002; because the Court has declined to convert the motion to dismiss into a motion for summary judgment, however, these documents must be excluded. *See* Fed. R. Civ. P. 12(d).

*subject to* reporting under [EPCRA § 312]." Therefore, it argues, the allegations of EPCRA reports 12 years before the transfer are not sufficient to render the Cooper Drive site "property" under RPTL and trigger disclosure requirements.

The Court disagrees. To begin, it does not appear that any Indiana court, much less the Indiana Supreme Court, has ever interpreted the statute in question. But as a matter of first impression, the Court agrees that the definition of "property" for RPTL purposes in Ind. Code § 13-11-2-174 should not be construed to mean that a facility must be required to file an ECPRA inventory report for the current calendar year before disclosure is mandated. First, as the plaintiff notes, the purpose of RPTL is to provide a broad swath of environmental information, including "regulatory information during the transferor's ownership, site information under other ownership or operation, [and] any environmental defects." Ind. Code § 13-25-3-7.5 An "environmental defect" is broadly defined as any "environmentally related commission, omission, activity, or condition" that would violate environmental laws, "require remedial activity," present a "substantial endangerment" to public health, public welfare, or the environment, "have a material, adverse effect on the market value of the property," or would interfere with another's ability to obtain environmental permits or licenses. *Id.* § 13-11-2-70.

Because the purpose of the statute appears to be to disclose as much information related to environmental conditions on the property as possible, it makes sense to read the statutory definition of "property" broadly as well. Looking at the three categories that meet the definition of "property," they appear intended to cover those properties where there is an elevated risk of environmental defects: underground storage tanks pose a risk, even if the transferor did not put them there; CERCLIS list sites have already been identified by the EPA as actually or potentially

contaminated; and the "ECPRA reporting" category clearly (to the Court, at least) is intended to cover those facilities that have been handling large amounts of hazardous chemicals, raising the likelihood of an accidental (or intentional) release and environmental defect. Given the broad purposes of RPTL and the broad disclosures required by the IDEM form, it makes little sense to exclude from the class of "property" for which the disclosures are required a transferor that was formerly required to submit hazardous material inventory reports under EPCRA but has ceased (or reduced) operations prior to the current calendar year.

IDEM appears to share this broad view of RPTL's purposes. Its "Environmental Disclosure for Transfer of Real Property" form (the disclosure document at issue), asks broad questions apparently designed to solicit information on past regulatory compliance as well as specific information that would allow a transferee to investigate potential unknown environmental defects. For example, the form broadly asks whether the transferor has "ever conducted operations on the property which involved the generation, manufacture, processing, transportation, treatment, storage, or handling of a 'hazardous substance," or whether certain common hazardous waste storage and disposal units are "at the property that are used or *were used* by the Transferor." Pl. Resp. Ex. L, DE 90-12 at 3. It inquires whether the transferor *has been* required to file an EPCRA hazardous chemical inventory or a toxic chemical release form, and whether the transferor or any facility on the property *has been* subject to certain state or federal government actions. *Id.* at 5. Finally, it asks for limited information on *previous* owners and operators. *Id.* at 8.

Under Flexsteel's cramped reading of the statutory definition of "property," the RPTL disclosure requirements would be so limited that they would defeat the statutory purpose. A

transferor that had stored (and perhaps released) substantial amounts of hazardous waste over the course of decades could avoid disclosure requirements by ceasing operations and removing hazardous chemicals before the beginning of the calendar year in which it intends to transfer the property, thus eliminating any reporting requirement despite known or suspected environmental defects. Given the broad purpose of RPTL—not to mention the substantial consequences of noncompliance—it simply makes no sense that the legislature intended to limit its coverage so drastically. So while it is true, as the defendants note, that the use of present tense language in a statute may indicate an intent to focus on current and ongoing activity, *see White v. Indiana Democratic Party ex rel. Parker*, 963 N.E.2d 481, 488–89 (Ind. 2012) (construing use of present tense in a statute to require "current and ongoing activity), it is also true that "[c]ourts are not bound to adopt a construction that would lead to manifest absurdity in order that the strict letter of the statute may be adhered to." *Lightpoint Impressions, LLC v. Metro. Dev. Comm'n of Marion County*, 941 N.E.2d 1055, 1059-60 (Ind. Ct. App. 2010).

Finally, it is worth noting that looking only at the complaint itself, dismissal does not appear appropriate even under Flexsteel's interpretation of RPTL's definition of "property." Although the plaintiff does not appear to contest Flexsteel's claim that the Copper Street site has not been in active operation for over five years, the Court notes that the complaint does not, as defendants claim, admit that the property has not been subject to EPCRA reporting requirements since 1993. The lack of any allegation that EPCRA Tier II reports were submitted any time after 1993, might imply that none were (though that is not the appropriate standard on a motion to dismiss). But RPTL's definition of "property" does not say that a transferor must have been *complying* with EPCRA reporting requirements at the time of the transfer, merely that it be

*subject to* those reporting requirements. The complaint includes allegations that the defendants had previously submitted EPCRA reports in the 1990s and were storing hazardous waste on the property in late 2001. *E.g. id.* ¶¶ 491, 493, 499, 519–20. And although it notes that manufacturing activities had ceased "as of the date of transfer," the allegations do not rule out the possibility that activities within the past calendar year triggered a EPCRA reporting requirement at the time of transfer. Thus, even under the defendants reading of the RPTL property definition's "subject to" language, it is not implausible that the plaintiffs could prove a current reporting obligation.

Finally, the Court notes that Flexsteel argues that the six-year statute of limitations applicable to property claims has already run. *See* Ind. Code. 34-11-2-7(3). Assuming that the defendants are correct that a six-year period applies to this action, rather than the general ten-year statute of limitations, it is still impossible to decide the statute of limitations issue based on the pleadings alone because Land claims that he could not possibly have discovered the violation of the RPTL until after the pollution was discovered in 2007. *See Filip v. Block*, 879 N.E.2d 1076, 1082 (Ind. 2008) (under discovery rule, statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered the injury).

For these reasons, the Court will deny Flexsteel's motion to dismiss Count V of the first amended complaint.

## VI. CONCLUSION

The plaintiffs may not proceed under 42 U.S.C. § 6972(a)(1)(A) because they have not plausibly alleged that the former owners and operators of allegedly contaminated sites are engaged in ongoing violations of RCRA laws, regulations, or standards. Their claim under 42

U.S.C. § 6972(a)(1)(B), however, requires factual development to determine whether there is an imminent and substantial danger and whether the EPA or IDEM are actually engaging in removal activities, and thus Count IV survives. Finally, Count V states a failure to disclose claim under the RPTL. Accordingly, for the reasons discussed at length above, the Court

**GRANTS** Defendants David Dygert's and Greg Lucchese's Motions to Join in Flexsteel Industries Inc.'s Motion to Dismiss [DE 72, 73];

**GRANTS** Defendant Flexsteel's Motion for Leave to File Two Separate Motions to Dismiss [DE 65];

**GRANTS** Defendants' Joint Motion to Dismiss [DE 66, 69, 71] with respect to Count III, and **DENIES** the motion with respect Counts IV and V;

**DISMISSES** as moot Defendants' Motion for Hearing [DE 68] re the Joint Motion to Dismiss; and

**DISMISSES** as moot Plaintiffs' Motion to Delay Summary Judgment [DE 91].

SO ORDERED.

ENTERED:   March 25, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court