UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CHRISTOPHER BROWNING, *et al.*, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:11-CV-480 JD |
| | ) | |
| FLEXSTEEL INDUSTRIES, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the defendants' Joint Motion to Dismiss Counts I and II of the First

Amended Complaint [DE 74]. These two Counts are brought under the citizen suit provision of

the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. § 1964(c). The Court

has previously ruled on motions to dismiss the remaining counts, dismissing Count III but

allowing Counts IV and V to proceed. Although the plaintiffs allege that the various defendants

have engaged in many troubling activities, including environmental crimes, mail fraud, and

possibly obstruction of justice, they have not stated a claim that any defendants violated RICO,

because the complaint does not adequately allege either a RICO "enterprise" or a "pattern of

racketeering activity." The Court will therefore grant the defendants' joint motion to dismiss

Counts I and II.

## I. BACKGROUND

In its previous order, the Court summarized the plaintiffs' complaint:

The plaintiffs here are residents or owners in a housing development subject to
severe groundwater contamination allegedly caused by the defendants'
unpermitted and unlawful dumping of industrial solvents and other hazardous
waste. In addition to a toxic tort suit in Indiana state court, they filed a five count
complaint in this court. Counts I and II seek treble damages under the Racketeer
Influenced and Corrupt Practices Act ("RICO") for an alleged scheme of mail and

> wire fraud and obstruction of justice designed to conceal the violations and responsibility from the EPA and the public. Counts III and IV seek injunctive relief under the Resource Recovery and Conservation Act ("RCRA"). In Count V, plaintiff Fred Lands, who owns the site on which defendants allegedly dumped their hazardous waste, seeks damages under the Indiana Responsible Property Transfer Law ("RPTL").

*See* DE 107 at 1–2. That order also summarized the plaintiffs' allegations regarding the defendants contamination of the groundwater underneath the plaintiffs' property. This order will not recount those facts, except to the extent necessary to understand the plaintiffs' RICO claims, which by-and-large allege an attempt by the defendants to conceal their environmental crimes and evade liability for their actions.

From 1983 until 1997, defendant David Dygert operated Dygert Seating, Inc. ("DSI") on two adjacent tracts of land in Elkhart, Indiana—23542 Cooper Drive and 53381 Marina Drive. (These, together, are referred to as "the site" throughout this order.) The Cooper Drive facility was used for metalwork in connection with seat-manufacturing; the Marina Drive facility was used to manufacture foam seats that were attached to metal frames. During this time, the plaintiffs allege that Dygert and his employees (including defendants Greg Lucchese and Gerald Alexander) dumped industrial solvents, including trichloroethylene ("TCE"), methylene chloride, and 1, 1, 1 trichloroethane (TCA), directly into the ground, in violation of RCRA. *See* First Amended Complaint, DE 24, ¶¶ 124–126.

In 1996, DSI ran into financial difficulties and was liquidated in connection with a Chapter 11 bankruptcy in March 1997. *Id.* ¶ 13. Flexsteel Industries purchased its assets, hired most of its workforce, and continued to run Dygert Seating at the site as a division of Flexsteel. *Id.* Just prior to Flexsteel's acquisition of DSI's assets, Flexsteel and DSI jointly ordered a "Phase I Environmental Site Assessment" for the site from Weaver Boos Consultants. *Id.* at ¶

376. Weaver Boos interviewed Greg Lucchese as part of its assessment, and he falsely reported that to the best of his knowledge, there were no environmental concerns associated with the facilities. *Id.* ¶ 379. He also allegedly instructed DSI employees to conceal evidence of dumping from Weaver Boos. *Id.* ¶ 384. Weaver Boos concluded that "the results of the Phase I ESA revealed no evidence of recognized environmental conditions in connection with the subject property," and mailed its report to Flexsteel's headquarters in Dubuque, Iowa. *Id.* ¶ 399.

When Flexsteel acquired DSI's assets, it discovered several barrels of solvent and waste oil that DSI had accumulated on the site. *Id.* ¶¶ 261–63. Neither DSI nor Flexsteel had an Environmental Protection Agency ("EPA") identification number for the site, and therefore could not lawfully transport and dispose of this waste. *Id.* ¶ 774. Knowing that applying for the required identification number would reveal that hazardous waste was being generated on the site and expose Flexsteel to RCRA inspection (as well as, apparently, waste generator fees for the site), Flexsteel hired Tris Gour to devise a scheme to dispose of the waste from a site at which DSI had formerly operated its Goshen Cushion division, and which had previously been issued an EPA identification number. *Id.* ¶¶ 270–71. As part of Gour's plan, Flexsteel illegally transported the barrels of hazardous waste from the DSI site (and perhaps from other Flexsteel locations) to the Goshen Cushion site. *Id.* Then, in his capacity as CEO of the defunct (but still extant) DSI, David Dygert falsely certified to the Indiana Department of Environmental Management ("IDEM") that the waste had been generated at the Goshen Cushion site. *Id.* ¶¶ 326-330. The scheme worked, and IDEM reissued the previous EPA identification number, which Flexsteel used to dispose of the hazardous waste that it had collected at the Goshen Cushion site.

Flexsteel continued operations at the site through its Dygert Seating Division, and the unlawful dumping of hazardous materials continued unabated throughout its tenure on the property. Greg Lucchese ceased employment with Flexsteel in April 2000, and David Dygert and Gerald Alexander stopped working for Flexsteel on January 1, 2002. In 2002, Flexsteel obtained another Phase I Environmental Site Assessment from Weaver Boos. *Id.* ¶ 401. Weaver Boos reviewed its 1997 report and conducted additional interviews, but Flexsteel again falsely denied knowledge of any environmental conditions on the property. *Id.* ¶¶ 401–429. Weaver Boos again concluded that its "assessment has revealed no evidence of recognized environmental conditions in connection with [the site]," and again mailed the report to Flexsteel's headquarters in Iowa. *Id.* ¶ 430.

In 2005, Flexsteel sold the Cooper Drive property to plaintiff Fred Lands, without revealing the environmental contamination. *Id.* ¶ 433. As part of their purchase agreement, Flexsteel and Lands agreed to split the cost of a Phase I Environmental Site Assessment. *Id.* ¶ 433. Rather than conduct a new assessment, however, Flexsteel sent Lands a copy of the 2002 Phase I report, which it knew was—had caused to be—inaccurate. *Id.* ¶ 435. Relying on the 2002 Report, and without knowledge of the true environmental condition of the property, Lands closed on the purchase of the Cooper Drive Property and now owns the site. *Id.* ¶¶ 437–440.

In August 2007, area residents (including many of the plaintiffs) had their tap water tested and discovered significant TCE contamination well above federal maximum levels. EPA and IDEM responded by providing bottled water and carbon filters and entered into a cooperative agreement to investigate, monitor, and evaluate the site. *See* DE 67-2. In April 2008, IDEM and EPA conducted groundwater testing in and up gradient of the plaintiffs' subdivision

and identified a plume of groundwater contamination originating at the site. *See* DE 24 ¶¶ 450–452. Dygert learned of the EPA investigation in August 2008 and sent an e-mail to EPA claiming that he knew of no contaminates used during the time when he ran operations at the site for DSI, Flexsteel, or succeeding companies. *Id.* ¶ 476. Later that month, an EPA agent contacted Greg Lucchese as part of the investigation. *Id.* ¶ 525. In a phone interview, Lucchese falsely stated that "the company did not use degreaser or solvents in the production process." *Id.* ¶ 526.

In September 2008, IDEM's site inspection report concluded that "[t]he drinking water in residential wells continues to contain elevated levels of [volatile organic compounds] (some above [the federal maximum containment levels]) prior to filters, and additional private wells have the potential to become contaminated because ground water flow is toward more residential wells which are not currently impacted." *See* DE 67-6 at 61–62. Within two months, the EPA had connected 26 homes, including the plaintiffs', to municipal water. *See* DE 67-8 at 3. The EPA has not yet, however, definitively identified DSI or Flexsteel as the source of the contamination. *Id.* ¶ 473; DE 94 at 7.

In March 2011, the plaintiffs in this action (except for Fred Lands) filed suit in Elkhart Circuit Court seeking damages and injunctive relief arising out of the contamination of the site, including claims for trespass, nuisance, negligence, negligent infliction of emotional distress, punitive damages, and for relief under Indiana's Environmental Legal Action statute. That case is still pending, as far as the Court is aware. DE 24 ¶¶ 540–544. In May 2011, the plaintiffs notified the defendants of their intent to bring a federal lawsuit under RCRA. *Id.* ¶ 545. To continue to conceal their environmental crimes, the defendants (Flexsteel, Dygert, Lucchese, and

Alexander) allegedly committed various acts of perjury in interrogatory responses and depositions (later relying on these false statements to seek summary judgment). As part of its ongoing attempt to evade liability, Flexsteel also used the discovery from the state court suit to attempt to convince EPA and IDEM that it was not responsible for the contamination on the site. *Id.* ¶¶730–44.

On December 15, 2011, the plaintiffs filed this action to assert two citizen suit claims under RCRA against Flexsteel and DSI, as well as plaintiff Fred Land's diversity action under Indiana's RPTL against Flexsteel. *See* DE 1. On May 15, 2012, the plaintiffs filed a 130 page first amended complaint pleading two RICO claims against Flexsteel and Dygert Seating, as well as David Dygert, Greg Lucchese, Tris Gour, Gerald Alexander. *See* DE 18. Two days later, the first amended complaint was sealed to protect the identities of two minor plaintiffs, and a redacted version of the amended complaint was filed. *See* DE 24. The Court refers to the redacted first amended complaint throughout this order.

In their initial and amended RCRA claims, discussed at length in the Court's previous order, the plaintiffs seek to force Flexsteel to clean up the contamination it caused. In the RICO claims that are the subject of this order, the plaintiffs claim that the defendants' various attempts to conceal their illegal dumping activities (as opposed to the environmental crimes themselves, which are not actionable under RICO), dating back to the late 1990s, form a pattern of racketeering activities that give rise to RICO liability. They identify two purported "enterprises" that they claim the defendants conducted (and conspired to conduct) through a "pattern of racketeering activities." The defendants now move to dismiss the RICO claims for failure to state a claim upon which relief can be granted, challenging nearly every aspect of the RICO cause of action.

## II. STANDARD OF REVIEW

Rule 12(b)(6) authorizes dismissal of a complaint when it fails to set forth a claim upon which relief can be granted. Generally speaking, when considering a Rule 12(b)(6) motion to dismiss, courts must inquire whether the complaint satisfies the "notice-pleading" standard. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012). The notice-pleading standard requires that a complaint provide a "short and plain statement of the claim showing that the pleader is entitled to relief," which is sufficient to provide "fair notice" of the claim and its basis. *Id.* (citing Fed. R. Civ. P. 8(a)(2)); *Maddox v. Love*, 655 F.3d 709, 718 (7th Cir. 2011) (citations omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). In determining the sufficiency of a claim, the court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (citation omitted).

In recent years, the Supreme Court has adopted a two-pronged approach when considering a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citing *Twombly*). First, pleadings consisting of no more than mere conclusions are not entitled to the assumption of truth. *Id.* This includes legal conclusions couched as factual allegations, as well as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Second, if there are well-pleaded factual allegations, courts should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*McCauley v. City of Chi.*, 671 F.3d. 611, 615 (7th Cir. 2011) (citing *Iqbal* and *Twombly*).  The

complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations

that raise a right to relief above the speculative level." *Maddox*, 655 F.3d at 718 (citations

omitted).  However, a plaintiff's claim need only be plausible, not probable. *Indep. Tr. Corp.*,

665 F.3d at 935 (quoting *Twombly*, 550 U.S. at 556).  "[A] well-pleaded complaint may proceed

even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery

is very remote and unlikely." *Id*.  In order to satisfy the plausibility standard, a plaintiff's

complaint must "supply enough fact to raise a reasonable expectation that discovery will yield

evidence supporting the plaintiff's allegations." *Id*.  Determining whether a complaint states a

plausible claim for relief is "a context-specific task that requires the reviewing court to draw on

its judicial experience and common sense," *see Iqbal*, 556 U.S. at 679 (citation omitted), and the

Court will assess the plaintiffs' claims accordingly.

> Rule 10(c) describes the type of materials that can be considered to be part of a pleading:
>
> A statement in a pleading may be adopted by reference elsewhere in the same
> pleading or in any other pleading or motion.  A copy of a written instrument that
> is an exhibit to a pleading is a part of the pleading for all purposes.

Fed. R. Civ. P. 10(c). This means that a court can consider for purposes of a Rule 12 motion,

documents that are attached to a motion to dismiss if they are referred to in the complaint and are

central to the plaintiff's claims. *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006); *see

Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6)

can be based only on the complaint itself, documents attached to the complaint, documents that

are critical to the complaint and referred to in it, and information that is subject to proper judicial

notice.") (citations omitted).

## III. ANALYSIS

RICO "provides a private right of action for treble damages to any person injured in his business or property by reason of a violation of the Act's criminal prohibitions." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 641 (2008). Two RICO prohibitions are relevant here. First, 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprises's affairs through a pattern of racketeering activity or collection of unlawful debt." Second, § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." The Court first analyzes whether the complaint alleges an "enterprise" and a "pattern of racketeering activity." Finding neither, the Court concludes that the complaint states a claim for neither conducting an RICO enterprise though a pattern of racketeering activities under § 1962(c), nor conspiring to do the same § 1962(d).[1]

A.      **The Plaintiffs Fail to Allege an "Enterprise" or a "Pattern" under § 1962(c)**.

To allege a claim under § 1962(c), a plaintiff must alleged that the defendant—here, *each* defendant*—(1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity. *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001).

---

[1]Because the Court dismisses the complaint for failure to state a claim, it does not consider the defendants' argument that the statute of limitations has run. RICO's statute of limitations expires four years from when a potential plaintiff "discovers (or should if diligent have discovered) both the injury that gives rise to his claim and the injurer." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386 (7th Cir. 2010). In this case, the plaintiffs discovered their injury in 2007, but there is a dispute over whether the plaintiffs had also discovered the injurer by May 15, 2008 (the RICO claims were filed on May 15, 2012) and whether the answer to this question is clear from the complaint. Given the possibility of factual clarification of this issue, the Court would be inclined to resolve the statute of limitations at a later stage, were the RICO claims to survive.

## 1. The plaintiffs have failed to plead a proper RICO enterprise.

To state a claim under RICO, a "complaint must identify the enterprise." *Chricton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (quoting *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995)). A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The plaintiffs identify two distinct enterprises. The first is the legal entity DSI. As a corporation, it clearly meets the definition of "enterprise" under § 1961(4). But it need not detain us long because the allegations concerning the DSI enterprise cannot possibly amount to a RICO violation. Even assuming the alleged conduct in furtherance of the scheme to defraud IDEM between May 1, 1997, and May 5, 1998 qualifies as predicate acts, the alleged pattern of racketeering activity with respect to the DSI enterprise involved a single scheme involving three separate mailings and lasting barely one year. As discussed *infra* in Part A.2.i, this is patently insufficient to establish a "pattern of racketeering activities" with which any defendant conducted the DSI enterprise.

The second identified enterprise is an informal "association-in-fact" allegedly formed by Dygert, Lucchese, Gour, Alexander, DSI, Flexsteel, and perhaps others. An association-in-fact is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Such an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* More recently, the Supreme Court held in *Boyle v. United States*, 556 U.S. 938, 946 (2009), that an association-in-fact enterprise must also have some sort of "structure," consisting of "at least three structural features: a purpose, relationships

10

among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* 946. The Court clarified, however, that an association-in-fact need not be a business-like entity and identified a list of other potential structural features that are *not* required, including "hierarchy," "role differentiation," and "chain of command," to name a few. *Id.* at 947–948.

In this case, it is difficult to discern much structure at all to the purported association-in-fact. Since at least 2002, by which time DSI was dissolved and all of the individual defendant "associates" had ceased any employment with Flexsteel, the only coherence to the "association" is that its associates have allegedly falsely denied (in ways that perhaps constitute mail and wire fraud and obstruction of justice) their own responsibility for the environmental contamination at the site. Prior to *Boyle*, there is little question that the complaint would have failed to allege that the "enterprise" was in any way distinct from the "pattern." *See United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991) (""If the 'enterprise' is just a name for the crimes the defendants committed, or for their agreement to commit these crimes . . . , then it would not be an enterprise within the meaning of the statute." (citing *Turkette*, 452 U.S. at 583)). The defendants argue that the complaint must be dismissed for just this reason. The plaintiffs, on the other hand, do not even attempt to show a distinct structure bur rather counter that *Boyle* has done away with any such distinctness requirement.

So the question is how radically *Boyle* changed the RICO "enterprise" element. According to the plaintiffs, the enterprise element is all but (if not actually) merged with the pattern requirement. According to the defendants, *Boyle* was no "seismic shift" and instead merely refined, rather than eliminated, the enterprise requirement. At least one Seventh Circuit opinion (in dicta) appeared to view *Boyle* as dramatically changing existing law, virtually

despairing of the simplification of the enterprise requirement after *Boyle*. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) ("But the Supreme Court's recent decision in [*Boyle*] throws all in doubt."). Most opinions, however, have continued to treat the enterprise requirement as if it had meaningful content. *See, e.g.*, *United States v. Hosseini*, 679 F.3d 544 (2012) (finding an enterprise and upholding RICO conviction); *Rao v. BP Products North America, Inc.*, 589 F.3d 389 (2009) (dismissing civil RICO claim for lack of enterprise structure).

Despite the broad language of *Boyle*, it is too soon to conclude that the Supreme Court has essentially eliminated the "enterprise" requirement. Taken at face value, *Boyle* itself intended to do no such thing—it confirmed that a structure is indeed a necessary element of a RICO enterprise and stressed that it had no intention of merging the enterprise requirement with either the pattern of racketeering activity or the separate crime of conspiracy. *Boyle*, 556 U.S. at 950 & n.5. *Boyle*'s two important holdings are (1) that although "enterprise" and "pattern" are distinct elements, it would be incorrect to imply to a jury that the evidence establishing a pattern of racketeering activity can *never*, without more, prove the existence of an enterprise, *id.* at 947; and (2) that although an enterprise must have some distinct structure, it may have any *type* of structure, and courts may not impose additional structural limitations beyond the basic three identified in the Court's opinion, *id.* at 946, 948.

The first holding is hardly radical or a seismic shift. It simply confirms precisely what the Court said nearly 30 years earlier in *Turkette*, "that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Boyle*, 556 U.S. at 847 (quoting *Turkette*, 452 U.S. at 583). The second holding does work a significant change in the law of many circuits, stripping away any need to show a

"business-like" structure (as the dissent would have required) or to demonstrate that the enterprise conformed to any particular structural blueprint. *Id.* at 945. But read carefully, *Boyle* is simply a case dealing with the *types* of structures that can satisfy the enterprise element; although *Boyle* identifies the minimum three structural elements that must be present in any enterprise—purpose, relationships, and longevity—it provides no detailed parameters regarding what is necessary to demonstrate each of those elements. It is up to the lower courts, for now, to flesh out the skeleton provided by *Boyle*.

That *Boyle* meant only to refuse to force RICO enterprise to conform to any particular preconceived notion of structure, rather than significantly (or completely) dissolve the distinction between an enterprise and a pattern, can be seen from the underlying facts of the case. Boyle was charged with RICO violations as well as nine counts of bank robbery and conspiracy to commit bank robbery. *Id.* 941–42. The evidence at trial established that he and others committed a series of bank robberies—primarily, but not exclusively, night-deposit boxes. *Id.* at 941. The robberies were coordinated group activities. *Id.* The participants met beforehand to plan, gather tools, and assign roles, and afterwards split the proceeds from the thefts. *Id.* Although there was a common core group of participants, others joined from time to time. *Id.* The group was loosely organized and there was no evidence that there was any leader or hierarchy or that the participants had a long term plan. *Id.* Despite the lack of formal organization, the group was very active: in the four years before Boyle joined the group, the core group was responsible for more than 30 night-deposit-box thefts, and over the course of the following five years Boyle "participated in numerous attempted night-deposit box thefts and at least two attempted bank-vault burglaries." *Id.*

Boyle requested an instruction to the jury that "the Government was required to prove that the enterprise 'had an ongoing organization, a core membership that functioned as a continuing unit, and an ascertainable structural hierarchy distinct from the charged predicate acts.'" *Id.* at 943. The district court refused the instruction, and instead told the jury that it could "find an enterprise where an association of individuals, *without structural hierarchy*, formed solely for the purpose of carrying out a pattern of racketeering acts," as long as the government proved "(1) [t]here was an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives; and (2) the various members and associates of the association functioned as a continuing unit to achieve a common purpose." *Id.* at 942. (quotes and marks omitted). It also noted that "common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* Finally, the district court explained that "it is not necessary that the enterprise have any particular or formal structure, but it must have *sufficient organization that its members functioned and operated in a coordinated manner* in order to carry out the alleged common purpose or purposes of the enterprise." *Id.* at 942 n.1.

Boyle objected to the jury instructions and the Supreme Court granted certiorari to consider "whether an association-in-fact enterprise must have 'an ascertainable structure beyond that inherent in the pattern of racketeering activities.'" *Id.* at 945. As noted already, the Court held that a structure *was* required, but that a jury need not be instructed in the terms requested, and that the required structure could, in particular cases, be proven by evidence of the pattern of acts itself.

Applying the Court's "three structural features" to the facts of *Boyle* and the jury instructions in that case, it is readily apparent that the district court's instructions adequately

explained the structural requirements to the jury, that the enterprise had the required structure, and that the structure was proved largely, if not entirely, by the evidence establishing the pattern of racketeering activity (bank robberies). Although the enterprise lacked a formal, business-like structure or hierarchy, it was sufficiently organized that a core group planned and executed dozens of jointly undertaken bank robberies over the course of a decade. It thus met *Turkette*'s requirement of a group of persons, functioning as a "continuing unit," and "associated together for a common purpose."

The enterprise also easily had the necessary three structural features. First, its associates did not merely have similar interests (robbing banks) but a truly *common* purpose of coordinating their efforts to commit crimes (and share the proceeds) that they could not have accomplished so effectively on their own, or by assembling an *ad hoc* collection of criminals each time. The evidence of this common purpose may be found not only in formal structural elements but also in the evidence of coordination itself. The element was conveyed in the district court's instructions that the association had to *function as a unit* in a *coordinated manner* to achieve a common purpose. Second, the relationships between the associates were demonstrated by the ability of the continuing unit to reassemble and coordinate its activities each time—the fact that the same core members of the enterprise met dozens of times to plan and execute bank robberies was certainly evidence of an ongoing interpersonal relationship between the associates. The district court's instruction regarding the necessity of a "framework" and a continuing unit conveyed the requirement that the associates of the enterprise be engaged in criminal activity *together* and be capable of repeatedly organizing over time. *See Boyle*, 556 U.S. at 946 ("The concept of "association" requires both interpersonal relationships and a common interest."). Finally, the enterprise's longevity was demonstrated by it success in at least attempting dozens

of coordinated bank robberies—the same evidence that established the pattern of racketeering activity. *Id.* ("[A]n enterprise must have some longevity, since the offense proscribed by [§ 1962(c)] demands proof that the enterprise had "affairs" of sufficient duration to permit an associate to "participate" in those affairs through "a pattern of racketeering activity.").

From the foregoing analysis, it is possible to give at least a little more meaning to *Boyle*'s structural requirements. First, an enterprise's "purpose" defines the reason that the enterprise forms in the first place. It must entail some form of collaborative, coordinated effort to accomplish a truly common end that could not be as effectively pursued individually. In this regard, it might be helpful to say that the enterprise must not only *have* a purpose, but must also *serve* a purpose. *Cf. In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010) ("We think, therefore, that if defendants *band together* to commit violations they *cannot accomplish alone*, then they cumulatively are conducting the association-in-fact enterprise's affairs, and not simply their own affairs." (emphasis added, citations omitted)). Second, "relationships among those associated with the enterprise" may not simply be *any* hypothetical relationships between one associate and other, but must be sufficient to demonstrate that the various associates are capable of functioning in a coordinated manner, as a continuing unit, to achieve the common purpose. Third, "longevity" merely means that the "relationships" persist long enough to accomplish the "purpose" of the enterprise. Thus defined, these three requirement enforce *Boyle*'s warning that proof "that several individuals, independently and *without coordination*, engaged in a pattern of crimes listed as RICO predicates . . . . would not be enough to show that the individuals were members of an enterprise." *Id.* at 947 n.4.

Turning, at last, to the alleged facts in this case in light of the criteria from *Turkette* and *Boyle*, it is impossible from the complaint to identify any "continuing unit" after 2002, at the

latest. Despite the breadth and depth of the plaintiffs' massive complaint, which spans 130 pages and over 800 numbered paragraphs, there is not a single allegation regarding the manner in which the various associates of the enterprise (defendants or otherwise) collaborated in any of the predicate acts allegedly committed after the initial 1997 scheme to illegally dispose of waste from the Goshen Cushion facility. The closest the plaintiffs come is a single perfunctory allegation that David Dygert was the leader of the enterprise and directed its affairs. Thus, the complaint states a conclusion without factual support.

There is not a single mention of how this was accomplished. As far as the Court can tell, there is no allegation that anyone other than Flexsteel was involved in the alleged mail fraud in connection with the 2005 sale of property to plaintiff Fred Lands. Nor is there any allegation that Dygert and Lucchese collaborated with each other or any other associates when they each allegedly falsely denied the use of contaminates to the EPA. When some of the current plaintiffs sued Flexsteel, and Dygert in the Elkhart Circuit Court, they may have imposed a "relationship" on the defendants—that of co-defendants. But there is no allegation that Flexsteel or Dygert (or Lucchese and Alexander, who also allegedly obstructed justice) coordinated their efforts. Assuming there was at one point a core unit to the alleged enterprise, nothing in the complaint suggests that this was a "continuing unit" at any point after 1998, or 2002 (when Dygert and Lucchese stopped working for Flexsteel) at the latest.

Nor does the alleged association-in-fact in this case fare well under the minimal structural requirements from *Boyle*. First, the complaint alleges that the common purposes of the association-in-fact were (1) to conceal evidence of illegal hazardous waste at the Site; (2) to conceal evidence of illegal storage of hazardous waste at the Site; (3) to conceal evidence of environmental crimes from environmental regulators; (4) to avoid the cost of properly disposing

of hazardous waste generated at the Site; and (5) to avoid the cost of remediating the environmental contamination at the Site. Complaint ¶ 9. Some of these sound suspiciously like Flexsteel's purposes alone—DSI was assetless and defunct by the spring of 1997 (and dissolved by 2000), while the individual defendants themselves will not be on the hook for remediation costs (they are not even named as defendants in the RCRA claims). Others, like concealing evidence of environmental crimes (and thus avoiding any consequences), are shared by each member of the group. But neither the complaint nor the plaintiffs' response brief explains how these shared interests are truly common interests, rather than parallel interests. More importantly, nothing suggests that the associates of the alleged enterprise have come together to pursue by common, coordinated efforts what they could not do on their own. Since 2005, the only predicate acts alleged have been individuals' denials (in one arena or another) of their own culpability. Nowhere does the complaint allege that, for example, Flexsteel is covering up Dygert's crimes or vice versa, or that either of them are covering up the crimes of some amorphous association-in-fact.

Second, with regard to "relationships among those associated with the enterprise," the Court has already noted that there are no allegations that the defendants have maintained any sort of interpersonal relationship since 2002. And those allegations supporting any interpersonal relationship before 2002 establish only that they were employed together at Flexsteel, not that they worked toward a common criminal purpose. Thus, even if the Court were inclined to infer that the defendants had a common purpose in forming an enterprise, the complaint does not allege that they maintained the necessary relationships among themselves to give their purported association any structure.

The plaintiffs argue that *Boyle* held that an enterprise could be proved from evidence of a pattern of racketeering activities and claim that the pattern they allege, if proved, would also establish an enterprise. They are of course correct that *Boyle* (and *Turkette* long before that) held that in particular cases the evidence of a pattern may establish an enterprise—or, as the district court in *Boyle* put it, that an enterprise is often demonstrated by what it does more than any abstract structure. But *Boyle* also makes clear that the alleged existence of a pattern does not *necessarily* establish the enterprise element. 556 U.S. at 947. One need only note how far removed the allegations in this case are from those in *Boyle* to see how the evidence of "pattern" in that case could suffice (dozens of coordinated bank robberies involving a core, though informally organized group of participants sharing proceeds over the course of a decade) where the allegations here do not (isolated and uncoordinated efforts to conceal each individual participant's involvement in a single scheme fifteen years ago). With no allegations of ongoing relationships or coordination of activities, this case falls into the category identified in *Boyle* of "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates." *Id.* at 947 n.4. The complaint does not adequately allege an enterprise, and thus the plaintiffs' § 1962(c) claim must fail.

This is consistent with the limited case law in the Seventh Circuit discussing the post-*Boyle* enterprise requirement. The Seventh Circuit has issued three published opinions since *Boyle* that have squarely considered the scope of a RICO enterprise.

First, in *Rao*, the court considered RICO allegations (among others) against BP Products, a BP regional sales representative, and another BP representative and her husband. 589 F.3d 389. This "enterprise" allegedly engaged in three predicate acts. Two BP representatives allegedly forced the plaintiff to sell his share of a station at a false price, under threat that he would lose

other franchises if he did not. *Id.* at 400. Then, unnamed BP employees threatened the plaintiff's BP franchises if he cooperated with an FBI investigation. *Id.* Finally, BP itself allegedly allowed one of the BP representatives to force the plaintiff to purchase two parcels of its land so that it would not have to purchase gas stations he maintained at fair value. *Id.* The court in *Rao* found it "difficult to see an enterprise with a structure that engaged in a pattern of racketeering activity from these allegations," which "contain different actors for each event , . . . do not indicate how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct." *Id.*

Second, in *Jay E. Hayden Foundation*, the Court rejected a RICO claim by a charitable foundation against an "enterprise" comprised of a crooked Illinois state judge, a bank, two law firms, and numerous individuals connected with the bank or the firms. 610 F.3d at 383–84. The banks, law firms, and individuals allegedly worked together with the judge over the course of nearly two-decades by allowing him to forge signatures and convert funds that they knew weren't his and by preparing false documents to facilitate the theft of funds from the foundation and related estates. *Id.* 384. The court dismissed the complaint on statute of limitations grounds, but went on to consider in dicta whether it would have stated a RICO claim if it had been timely. *Id.* at 385–88. The court explained that the allegations in the complaint really amounted to nothing more than "a conspiracy, between a judge-executor, lawyers, and a bank and its officers, rather than anything that looks even remotely like an enterprise, however informal; for there was no structure, organization, or leadership." *Id.* at 388. The Court noted that before *Boyle*, the claim would have failed because it did not identify a enterprise—with a structure, hierarchy, and the like—that was distinct from the conspiracy, but that after *Boyle,* nothing more was required than that the conspiracy have a common purpose, relationships, and longevity—each of which

was satisfied by the allegations of coordinated efforts to commit fraud over the course of nearly two decades. *Id.* at 388-89. After concluding that the simple conspiracy was likely an enterprise after *Boyle*, however, the court went on to observe that even if the conspiracy met the definition of enterprise, "the RICO offense is *using* an enterprise to engage in a pattern of racketeering activity" and "[t]he defendants did not *use* the conspiracy (the enterprise), they were the conspiracy." *Id.* at 389.

Third, in *United States v. Hosseini*, 679 F.3d 544 (7th Cir. 2012), the Court held that there was sufficient evidence to support criminal RICO convictions against two defendants who had operated three used-car dealerships in Chicago and regularly allowed area drug dealers to purchase expensive cars in cash while avoiding reporting requirements. The defendants argued that their conduct fell under the *Boyle* footnote discussed above because they were merely two "individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates." *Id.* at 558 (quoting *Boyle*, 556 U.S. at 947 n.4). The Court disagreed, holding that the defendants' conduct was "neither independent nor lacking in coordination" and explaining that "[t]ogether the defendants operated three auto dealerships, sharing bank accounts, health insurance, and employees. They transferred money back and forth with some frequency, referred customers to each other's lots, and sold vehicles to known drug dealers in exactly the same manner." *Id.* The Court found ample evidence of purpose (profiting through unreported cash auto sales), relationships (close personal relationships and co-operation of the dealerships), and longevity (at least a decade).

Of these three cases, the instant claims are most similar to *Rao*. Like that case, here the plaintiffs describe a series of acts undertaken by either Flexsteel or one of the various individual defendants and give no indication of how these actors were associated after 2002 at the latest, or

how they were "a group of persons *acting together* for a common purpose or course of conduct. *Rao*, 589 F.3d at 400 (emphasis added) (citing *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (upholding dismissal of RICO claim that failed to show the acts complained of were "the work of an organization, however loose-knit.")). In contrast to *Hosseini*, in this case there are no allegations of either any ongoing interpersonal relationships between the associates or any coordination in pursuit of the allegedly common ends. And there is even *less* of an enterprise here than the bare-bones conspiracy in *Jay Hayden* because there are no allegations of coordination among the associates for any acts committed after 2002. Moreover, even if the allegations here could establish the same sort of conspiracy as in *Jay Hayden*, the RICO claim would fail for the same reason: without allegations of coordination, the Court does not see how the defendants have *used* the association-in-fact to commit any of the predicate acts, rather than independently pursuing their own ends.

### 2. The complaint also fails to allege a pattern of racketeering activities.

A complaint must allege crimes specifically listed as predicate acts in the RICO statute. 18 U.S.C. § 1961(1) (defining "racketeering activity"). Here, consistent with Exhibit A of the First Amended Complaint, the crimes at issue are mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, obstruction of justice under 18 U.S.C. § 1503, and witness tampering under 18 U.S.C. § 1512. The Court will briefly touch on whether each of the alleged acts qualifies as a predicate act under RICO.

The claim must also allege that the predicate acts formed a "pattern." A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18

U.S.C.A. § 1961(5). As the Seventh Circuit has explained, to satisfy the pattern element, "the alleged acts of wrongdoing must not only be related, but . . . must 'amount to or pose a threat of continued criminal activity.'" *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) (quoting *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d F.3d 990, 1002 (7th Cir. 2004). "Continuity" may be shown either by a "'close-ended' scheme (a completed scheme that, by its duration, can carry an implicit threat of future harm,) or 'open-ended' scheme (a scheme that, by its intrinsic (e.g., business-as-usual) nature, threatens repetition of future harm." *Id.* at 705–06. Relevant factors in the continuity analysis "include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Id.* at 709 n.4 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). However, courts must keep an "eye toward achieving a natural and commonsense result, recognizing that Congress was concerned in RICO with long-term criminal conduct." *Id.* (citing *Vicon, Inc. v. Harbridge Merchant Servs. Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) (marks omitted).

Finally, a plaintiff must allege that the pattern of racketeering activities caused injury to his business or property. As the Supreme Court has recently explained:

> [T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well. Proximate cause for RICO purposes, we made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged. A link that is "too remote," "purely contingent," or "indirect" is insufficient.

*Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010) (quoting *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268, 271, 274 (1992) (internal marks and citations omitted)).

i. **Even if there was an "enterprise" before 2002, there was no "pattern."**

While there are no allegations of how the members of the alleged enterprise continued to associate and coordinate affairs after 2002 (and, if we are meant to infer the existence of an enterprise based solely on allegations of pattern, there is no alleged association after 1998), there were obviously relationships among the various actors before that date. Dygert, Lucchese, and Alexander were employees first of DSI and then Flexsteel. DSI sold its assets to Flexsteel and continued to exist during the transition. Gour was hired as an agent first for DSI and then for Flexsteel. Moreover, this group allegedly had a common purpose of disposing of waste illegally generated by DSI and Flexsteel at various sites without arousing the suspicions of regulators. And as alleged, it was necessary to enlist Dygert and DSI in the common enterprise in order to falsely certify that the 72 barrels of waste had been generated at the Goshen Cushion site. Finally, this enterprise had the longevity required to accomplish the goal, although, as discussed below, those goals themselves were short term. For the sake of argument only, the Court will also assume that this "enterprise," comprised of Flexsteel, its employees and agents, and a company whose assets it owned and whose CEO it employed, is sufficiently distinct from Flexsteel itself. *But see Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) ("[A]n employer and its employees cannot constitute a RICO enterprise."); *id.* at 227 (holding that the same rule applies to agents acting on the corporation's behalf).

At the pleading stage, it appears that the 1997 and 1998 false statements to IDEM regarding the drums of waste at the Goshen Cushion site amounted to mail fraud. The defendants are correct that under *Cleveland v. United States*, 531 U.S. 12, 26 (2000), fraudulently obtaining a waste disposal permit for the Goshen Cushion site does not, itself, constitute mail fraud,

because IDEM does not have a property interest in purely regulatory licenses. In their briefs, the plaintiffs argue that the intent of this fraudulent scheme was to deprive IDEM of hazardous waste generator fees at various sites where the waste had actually been generated. This seems to stretch the allegations, which appear to present these lost waste generator fees as a byproduct of the scheme to fraudulently obtain a permit and cover up for past violations. But applying a liberal interpretation of the allegations and accepting that the intent of the scheme was to obtain money that belonged to IDEM in the form of waste generator fees, then the allegations make out a claim that the defendants used the mails to further a scheme to defraud IDEM by means of materially false representations. The purported frauds on Weaver Boos in 1997 and 2002, however, fail to allege mail fraud under 18 U.S.C. § 1341. The plaintiffs do not allege that the scheme deprived anyone of money or property, merely that Weaver Boos was deceived into preparing a report that DSI (at first) and later Flexsteel allegedly knew was false. This is not mail fraud.

Thus, the only alleged pre-2002 RICO predicate acts are the 1997 and 1998 mailings in furtherance of the scheme to avoid waste generator fees by illegally transferring and disposing of hazardous waste. These allegations make out only a single scheme to defraud IDEM over the course of approximately one year, which is insufficient to plead a "pattern of racketeering activity." To begin, a one year pattern is inherently insufficient to state a RICO claim. *See Roger Whitmore's Auto. Servs, Inc. v. Lake County, Illinois*, 424 F.3d 659, 673 (7th Cir. 2005) ("Although we have not employed a bright-line rule for how long a closed period must be to satisfy continuity, we have not hesitated to find that closed periods of several months to several years did not qualify as 'substantial' enough to satisfy continuity."). Morever, even if the scheme had taken much longer to unfold, "when, as here, a complaint explicitly presents a distinct and

non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim." *Gamboa*, 457 F.3d at 709 (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 662–63 (7th Cir. 1992).

### ii. Flexsteel's 2005 mail fraud did not conduct the affairs of the "enterprise."

Moving forward in time, the complaint plainly alleges that Flexsteel committed mail fraud when it sent the Weaver Boos Phase I Environmental Report to Fred Lands, knowing it to be false, causing Lands to move ahead to close on the Cooper Drive property for a price that did not reflect the true value of the property. This mail fraud could qualify as a predicate act, but it is not at all clear in what way Flexsteel was conducting the supposed enterprise's affairs: no other "associates" were involved or had any interest (financial or otherwise) in this particular crime. As courts have repeatedly emphasized, "RICO 'liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Crichton v. Golden Rule Ins. Co*, 576 F.3d 392, 398 (7th Cir. 2009) . This is another reason why the threshold definition of the enterprise is so important, for if we cannot articulate what the enterprise is, and how it is distinct from its individual members, there is no way to determine whether a particular defendant is a person conducting that enterprise's affairs. *See id.*

### iii. The alleged obstruction of justice in state court and fraud on federal and state regulators do not form a pattern of racketeering activities.

The plaintiffs allege that beginning in 2011, various defendants engaged in acts of perjury in interrogatory answers, depositions, briefs, and other statements in the course of

26

discovery in the state court action against Flexsteel and Dygert. They also allege that Flexsteel attempted to influence witnesses in violation of 18 U.S.C. § 1512. As defendants point out (and plaintiffs acknowledge), obstruction of state court proceedings is not a RICO predicate act—to implicate 18 U.S.C. § 1503, the conduct must arise out of *federal* judicial proceedings. *See United States v. Van Engel*, 15 F.3d 623, 627 (7th Cir. 1993). What is more, the federal proceedings must be pending at the time of the obstruction. *See United States v. Cueto*, 151 F.3d 620, 633 (7th Cir. 1998).

The complaint seeks to clear this hurdle by alleging that the various defendants' conduct (including the witness tampering under § 1512) was aimed at obstructing *this* federal proceeding, which started out simply as an environmental citizen suit under the Resource Conservation and Recovery Act and which required the plaintiffs' to give advance notice to the defendants 90 days before filing suit. *See* 42 U.S.C. § 6972(b)(2)(B). The defendants argue that the notice of intent to sue did not make the federal proceeding pending, but at least two of the allegedly obstructive acts occurred *after* the RCRA complaint was filed in this Court on December 15, 2011. Even were this not so, the Court has concerns about a rule that a federal civil proceeding is *never* pending before a complaint is filed.  In the criminal context, obstruction can occur before a grand jury is impaneled if the conduct obstructs investigations undertaken with the intention of presenting evidence before a grand jury. *Cueto*, 151 F.3d at 634. Moreover, if the filing of a complaint was an necessary predicate to obstruction of a civil suit, defendants in RCRA or similar actions that mandate advance notice would receive a free window in which to obstruct the soon-to-be-pending proceedings without violating 18 U.S.C. § 1503. It seems untenable to conclude that a federal judicial proceeding can *never* be pending before a complaint is filed.

The other remaining predicate acts are the false statements to the EPA and IDEM, perpetrated by various defendants between August 2008 and March 2012. These statements are not obstruction of justice, because they do not arise from a federal judicial proceeding. *United States v. Aguilar*, 515 U.S. 593, 599 (1995) ("The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority."). The defendants argue that it also cannot be mail or wire fraud because the alleged false statements were made to IDEM and EPA in their capacity as government regulators and there are no allegations that the agencies were deprived of their own property. *See* DE 75 at 19. But it is alleged that at least the EPA has spent money connecting affected residents to municipal water, and these are costs that would likely have been bourn by Flexsteel if not for the alleged misrepresentations. This is likely enough to allege mail fraud.

But even if any of the alleged conduct constitutes predicate acts, and even if there were an enterprise through which they were conducted (that is, even if there were allegations of continuing relationships between the associates and coordination of activities), they still do not themselves form a pattern of racketeering activities for the same reasons the 1997–98 fraud failed this test standing alone: these predicate acts merely represent "a distinct and non-reoccurring scheme with a built-in termination point" (the eventual environmental remediation and assignment of responsibility), and there is no indication that the defendants have engaged or will engage in similar cover-ups of other crimes. *See Gamboa*, 457 F.3d at 709.

Put another way, the alleged fraud on EPA and IDEM and the alleged obstruction of the state court proceedings are simply attempts to cover up and avoid liability for earlier environmental crimes (which are not themselves RICO predicate acts). Labeling an crime and its

cover-up as a "pattern of racketeering activity" is problematic even where the underlying crime is itself a RICO predicate act, because a scheme to conceal underlying criminal activity does not extend the length of a RICO scheme. *See Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) ("A conspiracy ends when the design to commit substantive misconduct ends, it does not continue beyond that point 'merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished.'" (quoting *Grunewald v. United States*, 353 U.S. 391, 405 (1957)).

It may be that in some cases, the acts of concealment are integral to the underlying criminal scheme itself and therefore cause the alleged harm just as much as the non-predicate acts. Several of the plaintiffs' cases provide good examples of this, such as where predicate acts of money laundering are instrumental in covering up a non-predicate embezzlement scheme, *see City of New York v. Venkataram*, 396 Fed. App'x 722 (2d Cir. 2010) (unpublished disposition), or when mail fraud is necessary to induce the sale or lease of environmentally contaminated property, *see Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 Fed. App'x 94 (2d Cir. 2008), or when the mail fraud intended to deprive agencies of licensing and dumping fees allows environmental crimes to continue occurring without detection, *See United States v. Paccione*, 738 F. Supp. 691 (S.D.N.Y. 1990); *see also United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991). In this case, the harm suffered by all the plaintiffs (except Fred Lands, who was the victim of an unrelated scheme) was the environmental contamination itself, and that was caused by alleged dumping practices that had ended before 2008. By that time the contamination complained of was already present in the plaintiffs' groundwater, so the later concealment hardly allowed the underlying environmental crimes to continue. The alleged fraud and obstruction

29

between 2008 and 2012, therefore, did nothing "to extend the duration of the underlying [environmental] scheme." *Midwest Grinding Co.*, 976 F.2d at 1024.

## C. The Complaint Also Fails to State a RICO Conspiracy Claim under § 1962(d).

To state a RICO conspiracy claim against each defendant under § 1962(d), the plaintiffs must (1) identify a proper enterprise, (2) identify the defendant's association with that enterprise, and (3) allege that "the defendant knowingly joined a conspiracy, the objective of which was to operate that enterprise through a pattern of racketeering activity." *United States v. Tello*, 687 F.3d 785, 794 (7th Cir. 2012). The defendant need not have agreed to commit two specific predicate acts of racketeering that would establish a pattern himself. *Id.* at 792–93. As noted above, however, the plaintiffs have failed to sufficiently plead an enterprise that meets the structural requirements of *Boyle*, or that the defendants undertook a pattern of racketeering activities. Therefore, the RICO conspiracy allegations must likewise be dismissed.

## IV. CONCLUSION

For these reasons, Count I of the plaintiffs' complaint fails to state a claim under 18 U.S.C. § 1962(c), and Count II fails to state a claim under § 1962(d). Accordingly, the Court **GRANTS** the defendants' Joint Motion to Dismiss Counts I and II of the plaintiffs' First Amended Complaint [DE 74], and **DISMISSES** Counts I and II against all defendants.

SO ORDERED.

ENTERED:    June 25, 2013.

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court